Willie Earl CAMPBELL, Dale Christee, on behalf of all present and future inmates of the Sebastian County Detention Center, Appellants,

v.

William CAUTHRON and Harrel Nichols, Appellees.

No. 78–1838.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 10, 1979.

Decided May 29, 1980.

Before GIBSON,[*] Chief Judge, and HEANEY and ROSS, Circuit Judges.

HEANEY, Circuit Judge.

Willie Campbell and Dale Christee, inmates at the Sebastian County jail, appeal from the dismissal of their class action challenge to numerous conditions of confinement at the jail. They contend that their constitutional rights are being abridged by (1) overcrowding and lack of exercise, (2) inadequate diet, (3) forced exposure to religious witnessing, (4) restricted visitation privileges, (5) denial of access to newspapers, (6) insufficient medical care, and (7) inadequate security. We agree that the jail is unconstitutionally overcrowded and that many prisoners are deprived of necessary exercise. We also agree that the diet has at times been deficient and inmates are at times exposed to religious witnessing against their will. We hold, however, that the district court correctly found that there was insufficient evidence on this record to justify relief on appellants' remaining contentions.

## I. THE CONSTITUTIONAL STANDARD

The plaintiff class is composed of former, present and future inmates of the Sebastian County jail, including pretrial detainees, convicted misdemeanants and felons serving sentences, and convicted felons awaiting transfer to the penitentiary. For purposes of defining the constitutional standard to be applied to the conditions in the jail, we consider the pretrial detainees and the convicted prisoners separately.

■ Convicted prisoners are protected by the Eighth Amendment to the United States Constitution which prohibits the imposition of cruel and unusual punishment.[1] Like most constitutional declarations, the

Matthew T. Horan, Fayetteville, Ark., for appellants.

Ronald G. Fields, Fort Smith, Ark., for appellees; J. Lamar Porter, Deputy Pros. Atty., Fort Smith, Ark., on brief.

---

[*] The Honorable FLOYD R. GIBSON was Chief Judge of the Eighth Circuit at the time this case was submitted and took senior status on December 31, 1979, before the opinion was filed.

1. The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S.Const. Amend. VIII. The Eighth Amendment has been made applicable to the states through the Fourteenth Amendment. *See Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962); *Jackson v. Bishop*, 404 F.2d 571, 576 (8th Cir. 1968).

exact meaning of "cruel and unusual punishment" is somewhat elusive. Consequently, we look to the broad principles underlying the constitutional terms. "The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. * * * [T]he words of the Amendment are not precise, and * * * their scope is not static. The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 100–101, 78 S.Ct. 590, 598, 2 L.Ed.2d 596 (1958) (footnote omitted). The Amendment prohibits penalties "that transgress today's 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency.'" *Hutto v. Finney*, 437 U.S. 678, 685, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976); *Jackson v. Bishop*, 404 F.2d 571, 579 (8th Cir. 1968)).

█ Although some courts have applied Eighth Amendment principles in evaluating the conditions under which unconvicted persons are imprisoned, the Supreme Court has recently held that such conditions are to be judged by the due process standard of the Fifth and Fourteenth Amendments. *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Since the due process clause prohibits punishment prior to conviction, the Court reasoned, the constitutional issue rests on a determination of whether the conditions of confinement are punitive in nature. This inquiry, in turn, focuses on whether the detention facility officials have acted with intent to punish the inmates. Even in the absence of express punitive intent, "if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Id.* at 539, 99 S.Ct. at 1874.

In addition, the Court in *Bell* recognized that pretrial detainees "retain at least those constitutional rights that * * * are en-joyed by convicted prisoners." *Id.* at 545, 99 S.Ct. at 1877. Within a given institution, then, conditions found to constitute cruel and usual punishment when imposed on convicted inmates would surely be viewed as unconstitutional punishment when imposed on similarly situated unconvicted detainees. *See Detainees of Brooklyn House of Detention for Men v. Malcolm*, 520 F.2d 392, 398 (2d Cir. 1975).

█ In applying these constitutional standards, we are mindful of our limited role in reviewing the practices of state penal institutions. In the absence of constitutional violations, we defer to the judgment of state prison administrators. *See Bell v. Wolfish, supra*, 441 U.S. at 538–539, 99 S.Ct. at 1873–1874; *Pell v. Procunier*, 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974). Nevertheless, we must not "abdicate [our] constitutional responsibility to delineate and protect fundamental liberties." *Id.*

## II. DETENTION CENTER CONDITIONS

1. *Overcrowding and lack of exercise.*

a. *Violation.*

The Sebastian County jail, built in 1936, is located on the fourth and fifth floors of the Sebastian County Court house in Fort Smith, Arkansas. The jail is reasonably modern, is equipped with central heat and airconditioning, and is relatively clean and well ventilated. The district court commented, "It is as nice a Courthouse as there is in the State of Arkansas. No one can find fault with the physical structure itself." While even the appellants might agree with this comment, it misses the point of their claim, that too many inmates spend too many hours in their cells without exercise.

Although there may be some exceptions, pretrial detainees are generally held in five barred cells located in the fifth floor east cell block. One of these cells is thirteen feet by eleven feet; the other four are thirteen feet by ten feet. All but one of the cells have eight bunks in them; the

remaining cell has six bunks. In the most crowded cells, therefore, each detainee has less than seventeen square feet of space when the cells are full—and that space includes the area occupied by the bunks, the wash basin and the open toilet. According to Sheriff Cauthron's testimony and defendants' exhibits, the average number of detainees in each cell in 1977 was approximately five, although some of the cells are frequently filled to capacity. As a practical matter, then, the inmates can do little but sit or lie on their bunks.

The detainees are ordinarily kept locked in their cells twenty-four hours per day, including meal times. They are released only three times per week for fifteen to thirty minutes for showers and exercise. They are also permitted to leave their cells to make court appearances.

Convicted prisoners are generally held in cells measuring fourteen feet by ten feet, or fourteen feet by eleven feet, with capacities of either six or eight inmates. When fully occupied, therefore, these cells afford each prisoner approximately eighteen to twenty-six square feet of living space, including the space occupied by the bunks, the wash basin and the open toilet. Again, the record shows that, at least at times, some of the cells are filled to maximum capacity.

Like the pretrial detainees, most convicted felons are kept in their cells around the clock, except for court appearances and thrice-weekly shower breaks. Misdemeanants, however, are eligible for trusty status,[2] enabling some of them to work in the detention center yard, garage, food service, or other areas during the day.[3] In addition, some misdemeanants serve in a work-release program, working at their regular employment during the day but returning to the jail to spend the night.

As noted, the cells in the Sebastian County jail are equipped to provide and often do provide convicted inmates with as little as eighteen square feet of living space. We have no trouble concluding that such crowded conditions constitute cruel and unusual punishment for those convicted inmates who are kept in their cramped cells for all but a few hours each week. The record contains uncontradicted expert testimony of the detrimental physical consequences of enforced idleness in a small living space, and the negative effect of overcrowding on prisoners' mental states is well documented in this and other cases. *See, e. g., Campbell v. McGruder*, 580 F.2d 521, 536–537 & n. 27 (D.C. Cir. 1978). Indeed, witnesses testified that three inmates had recently attempted suicide in the jail, two of them in the month prior to the trial of this case. In recent years, a number of Courts of Appeals, including this one, have determined that overcrowding in cell areas constitutes cruel and unusual punishment, even when the convicted inmates have considerably more cell space and greater exercise opportunities than the inmates in the Sebastain County jail. *See, e. g., Burks v. Teasdale*, 603 F.2d 59 (8th Cir. 1979), *aff'g Burks v. Walsh*, 461 F.Supp. 454 (W.D.Mo. 1978) (unconstitutional to hold two inmates in forty-seven-square-foot cells and three inmates in sixty-five-square-foot cells); *Johnson v. Levine*, 588 F.2d 1378 (4th Cir. 1978), *aff'g in part, Nelson v. Collins*, 455 F.Supp. 727 (D.Md.1978) (unconstitutional to hold two inmates in forty-four and 50.7-square-foot cells for ten to fifteen hours per day) *and Johnson v. Levine*, 450 F.Supp. 648 (D.Md.1978) (unconstitutional to hold two inmates in forty-square-foot cells; unconstitutional to hold inmates in dormitory with fifty-five square feet per inmate); *Battle v. Anderson*, 564 F.2d 388 (10th Cir. 1977)

---

**2.** According to Sheriff Cauthron, convicted felons who are serving sentences in the jail for relatively minor crimes are treated as misdemeanants for purposes of trusty status eligibility.

**3.** Sheriff Cauthron testified that trusties receive a credit, to be applied to any fine they may owe, of $15 for each day they are held in the

jail; non-trusties are credited at the rate of $10 per day. Although his testimony is somewhat equivocal, it appears that this policy may permit the jailing of indigent persons for failure to pay their fines. That, of course, would be clearly unconstitutional under *Tate v. Short*, 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130 (1971).

(adopting minimum standards of American Public Health Association: sixty square feet per inmate in cell, seventy-five square feet per inmate in dormitory). We also note that the minimum standards promulgated by the Arkansas Criminal Detention Facilities Board call for seventy square feet per inmate in cells plus thirty-five square feet per inmate in day rooms. These standards also require that recreational activities be provided for the inmates.

■ Similarly, we have no difficulty in concluding that the crowded conditions in the Sebastian County jail violate the pretrial detainees' due process rights under the Fifth and Fourteenth Amendments. In our view, this is just the kind of case the Supreme Court was referring to in *Bell v. Wolfish* when it stated, "[C]onfining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause as to whether those conditions amounted to punishment * * *." 441 U.S. at 542, 99 S.Ct. at 1875. In *Bell*, by a 5–1–3 vote, the Supreme Court held that double bunking in a seventy-five-square-foot room was not violative of due process. Unlike the situation in this case, however, the rooms in the facility in question in *Bell* were used only for sleeping; the inmates were generally locked in their rooms only between 11:00 p. m. and 6:30 a. m. and were free to move between their rooms and common areas during the rest of the day. The common areas contained a wide variety of exercise and recreational equipment. As the Supreme Court noted, the facility "differs markedly from the familiar image of a jail; there are no barred cells, dank, colorless corridors, or clanging steel gates." *Id.* at 525, 99 S.Ct. at 1866.

b. *Remedy.*

■ Because the Sebastian County jail is unconstitutionally overcrowded, we have no alternative but to require that the over-

crowding be eliminated. The record here is so complete, the violation so clear, and the precedent so compelling, that this Court can determine without remand the maximum number of inmates that may be held in each cell without contravening constitutional standards. In determining maximum occupancy, we consider that most inmates are confined in the jail for relatively short periods of time. Thus, the requirements are less stringent than they would be if this were a long-term facility. *See Hutto v. Finney, supra,* 437 U.S. at 686, 98 S.Ct. at 2572. ("[T]he length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards."). Accordingly, we hold that for those inmates who are confined to their cells for more than sixteen hours per day, the maximum number of inmates and bunks in each of the 130 to 154-square-foot cells shall be four. For those inmates who are held under such conditions for more than one week, the maximum number shall be three. Comparable space per inmate shall be allotted to those housed in the few cells that are larger or smaller than the normal 130 to 154-square-foot size.

■ Furthermore, to prevent enforced idleness from resulting in the type of physical degeneration described in the record, each inmate that is confined to his cell for more than sixteen hours per day shall ordinarily be given the opportunity to exercise for at least one hour per day outside the cell.[4] The determination of the type of exercise equipment and facilities available for this purpose shall be within the discretion of jail officials, subject to the approval of the district court. They must, however, provide a meaningful opportunity for exercise. Merely allowing the inmates to walk around in the narrow corridor between cells does not provide adequate exercise.

■ Inmates who are out of their cells during the day may be confined in smaller quarters at night without breaching constitutional requirements. Consequently, we

---

**4.** Jail officials may provide exercise opportunities within the cell for those inmates who

would jeopardize security if released from their cells.

**508**

hold that up to six inmates who are released from their cells for eight hours per day or more may be housed in the 130 to 154-square-foot cells. Again, comparable space requirements shall apply to such inmates housed in larger or smaller cells, and the number of bunks shall not exceed the maximum number of inmates permitted.

■ One further matter deserves consideration in connection with the cell space and exercise facilities in the jail. The district court appears to have placed undue emphasis on the cost of relieving overcrowding and providing exercise opportunities. The court stated, "*[I]n light of the tax money available*, the nature of the court house structure and all other factors, the physical plant is adequate." (Emphasis added.) As we have previously made clear, if states or counties operate detention facilities, they must meet constitutional standards. *Burks v. Teasdale, supra*, 603 F.2d at 62; *Jackson v. Bishop, supra*, 404 F.2d at 590; *see Detainees of Brooklyn House of Detention v. Malcolm, supra*, 520 F.2d at 399. We cannot permit unconstitutional conditions to exist simply because prison officials cannot or will not spend the money necessary to fulfill constitutional requirements. We note, moreover, that increasing the budget is not the only means to guarantee compliance with the Constitution. Overcrowding, for instance, may be eliminated by prudent changes in bail or sentencing policies.

2. *Diet.*

■ The standard diet for prisoners in the Sebastian County jail consists of two sweet rolls and coffee for breakfast, and frozen "TV" dinners for the noon and evening meals.[5] Dietitians called by both the plaintiffs and the defendants testified that this diet was calorically and nutritionally inadequate. Plaintiffs' expert testified

that an average-sized sedentary person on this diet could be expected to lose nine pounds per month, and he described the health hazards associated with diets, such as this one, that contain insufficient amounts of vitamin C and calcium. The defendants' expert agreed that the diet was inadequate in these respects, but felt that the daily addition of vitamin C-enriched juice, a glass of milk and a peanut butter sandwich would serve the needs of a sedentary inmate. Sheriff Cauthron testified that during the course of the trial, steps were taken to make the additions suggested by defendants' expert. It is clear from the record, however, that these suggestions had not been fully complied with at the time of trial.

Although it may be true that, as the district court noted twice in its opinion, the jail is not a "Country Club run for the enjoyment of the inmates," there can be no doubt that the Constitution requires that the jail diet be adequate to maintain the health of the inmates. "It is much too late in the day for states and prison authorities to think that they may withhold from prisoners the basic necessities of life, which include reasonably adequate food, clothing, shelter, sanitation, and necessary medical attention * * *." *Ahrens v. Thomas*, 570 F.2d 286, 289 (8th Cir. 1978) (quoting *Newman v. State of Alabama*, 559 F.2d 283, 286 (5th Cir. 1977)).

The record in this case is unclear on the extent to which the admitted dietary inadequacies have been remedied. Moreover, all of the testimony on diet concerned the needs of sedentary individuals; none of the experts considered the effect of exercise or trusty work on the inmates' dietary requirements. The district court, therefore, shall appoint a qualified dietitian to review the

---

5. Inmates who have money can purchase candy bars and ice cream from the jail commissary. These supplements, however, must not be considered part of the jail diet for purposes of determining its constitutionality because some of the inmates have no money to purchase these items. Moreover, the state is un-

der a duty to provide an adequate diet for all inmates. As Mr. Justice Blackmun recently observed, "It is society's responsibility to protect the life and health of its prisoners." *United States v. Bailey*, 444 U.S. 394, 100 S.Ct. 624, 641, 62 L.Ed.2d 575, 598 (1980) (Blackmun, J., dissenting).

diet provided by the jail. Upon recommendation of the dietitian, who may be the defendants' expert from the Arkansas Health Department, the district court shall issue whatever orders are necessary to ensure that the inmates are provided with a diet that meets constitutional standards.

### 3. *Exposure to religious witnessing.*

The plaintiffs challenge, on First Amendment grounds, the jail practice permitting lay witnesses to enter the cell blocks on Saturday and Sunday of each week to preach, sing and witness to the inmates. The district court treated this issue in summary fashion:

> The criticism of the plaintiffs directed against the voluntary efforts of [the witnesses] to talk with inmates about religion and alcoholism is without merit. The Court commends the three men for their solicitude for inmates and their efforts to acquaint them with Christianity and a better and saner way of life.

It must be made clear, however, that the issue is not, as the district court seems to suggest, whether the witnesses have a beneficial or harmful effect on the inmates. Rather, the question is whether the state is impermissibly establishing a religion or is infringing upon the free exercise of religion by the inmates. We find no support for plaintiffs' contention that simply allowing volunteers into the cell block constitutes an impermissible establishment of religion by the state. Forced inculcation, however, even by volunteer witnesses, would clearly contravene the Free Exercise Clause of the Constitution. The record contains somewhat contradictory indications, but it appears that the witnessing is often allowed to take place in such a manner as to make it nearly impossible for the inmates to "escape" the preaching. The jail officials must take steps, subject to the approval of the district court, to ensure that no inmate is subjected to forced religious indoctrination. Given the small size of the cells, it may well be that this can only be accomplished by setting aside a separate place for the witnesses to meet with the inmates.

### 4. *Other conditions.*

The inmates contend that the district court erred in failing to hold unconstitutional the jail policies relating to visitation, access to newspapers, medical care and security. While these policies are more restrictive than those found necessary in other well-run prisons and jails, and may well be counterproductive in the long run, we cannot say, on the basis of this record, that the district court's finding of constitutionality is clearly erroneous.

The cause is reversed and remanded to the district court. In accordance with this opinion, the district court shall issue such orders as are necessary to eliminate overcrowding, inadequate diet and forced religious indoctrination in the Sebastian County jail. The district court shall retain jurisdiction over this matter for a reasonable length of time to ensure that the jail conditions comply with the constitutional standards set forth in this opinion. In addition, the district court shall, consistent with the standards set out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), award to the appellants such attorney's fees as deemed appropriate for the district court representation. The appellants' attorney is entitled to an award of $2,000 for his services on appeal. *See* 42 U.S.C. § 1988; *Hutto v. Finney, supra*, 437 U.S. at 693–700, 98 S.Ct. at 2575–2579. The appellees shall bear all costs.