Michael G. **HEITMAN** et al., **Plaintiffs,**

v.

**Sheriff Gareld GABRIEL, et al., Defendants.**

**No. 79–6056–CV–SJ.**

United States District Court,
W. D. Missouri,
St. Joseph Division.

Oct. 20, 1981.

Claudia J. York, Kansas City, Mo., for plaintiffs.

Keith B. Marquart, Asst. Pros. Atty., Buchanan County, St. Joseph, Mo., for defendants Vanover, King and Mann.

Suzanne B. Bradley, St. Joseph, Mo., for defendants Gabriel, Thomas and Nix.

## MEMORANDUM OPINION AND INITIAL REMEDIAL ORDER

SACHS, District Judge.

This jail conditions litigation was initiated by a pro se filing by Danny Ray Wolfe and Michael G. Heitman, inmates at the Buchanan County Jail in St. Joseph, Missouri. It was approved as a forma pauperis filing by former Chief Judge Oliver in September, 1979. Seven cases were thereafter filed by additional inmates, both pretrial detainees and convicted persons under sentence. The Court requested the United States Attorney to enter an appearance as amicus curiae, in the absence of counsel for plaintiffs. After some limited discovery the Court requested Claudia York to enter her appearance as counsel for the plaintiffs, which she did in November, 1980. An amended complaint was filed by counsel in April, 1981. Class certification was granted, over objection, on June 2, 1981. The classes certified were (1) all present and future pretrial detainees and (2) all present and future inmates who are held in the jail after conviction.

The pro se complaints seek damages as well as declaratory and injunctive relief, naming as defendants (among others) the three county judges (county administrative officers), former sheriff Gabriel and the present sheriff, Glenn Thomas, who assumed office this year. Standard Pretrial Order (SPO) No. 2 III.3. The Court has advanced the injunctive and declaratory aspects of the case for expedited consideration, and has limited the responsibility of appointed counsel to those aspects of the case.

Somewhat pertinent to these proceedings are three bond elections in Buchanan County, the last of which was held in August, 1981, at which a majority of voters, but not the necessary two-thirds, voted for bonds to replace the jail. Trial to the Court was had between August 24 and September 1, 1981. The Court heard, among others, present inmates of the jail and former inmates, some now incarcerated at state correctional institutions in central Missouri. Two days

of testimony were scheduled in the United States Courthouse, Jefferson City, Missouri. Expert witnesses were heard, including former and present county officials, having wide experience in federal and state penal systems. This Memorandum Opinion constitutes the findings of fact and conclusions of law of this Court pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

A considerable range of constitutional violations has been asserted. The defendants recognize that the present jail is antiquated (erected in 1910), SPO No. 2 III.5, is somewhat dilapidated and offensive in its plumbing facilities, and that services provided inmates are quite limited. Personnel of the sheriff's office have requested increased staffing, most notably in the late 1979 budget request of former sheriff Gabriel. It is tacitly agreed by both sides that lack of financial resources is the source of most if not all of the evils presented by the testimony. One of the pro se plaintiffs seeks $1 in damages from former sheriff Gabriel and the balance of his $3,000,000 claim from the county judges who allocate funds to the sheriff. The county judges, through counsel, assert that the county is in a serious financial bind. The assessed valuation of property in the county is some $226,000,000, as compared with a valuation of $558,000,000 in Clay County (part of the Kansas City metropolitan area) which has a somewhat similar jail population. *Official Manual*, State of Missouri, 1979–80. See also, Plaintiffs' Proposed Finding of Fact 10.

■ All parties recognize that costs cannot be permitted to stand in the way of eliminating prison conditions which have fallen below Eighth Amendment and Due Process standards. *Wright v. Rushen*, 642 F.2d 1129, 1134 (9th Cir. 1981).[1] The Court is prepared, however, to focus some attention on costs, so as to stay its hand when "otherwise generally praiseworthy compassion might tempt it to adopt an unnecessarily expensive and comprehensive remedy." Id. In other words, although a conclusion that constitutional violations have occurred will carry with it the power to order correction of conditions that have fallen below a decent minimum, and, according to some authorities, the right to insist on conditions which will provide some margin of safety, the Court does not have the authority to require all expenditures which would make the jail a model prison. Published jail standards establish goals but do not reflect the constitutional minima. *Rhodes v. Chapman*, —— U.S. ——, 101 S.Ct. 2392, 2400 n. 13, 69 L.Ed.2d 59 (1981). Desirable conditions can only be created by voluntary actions of the Buchanan County authorities, subject to the democratic processes. See *Ahrens v. Thomas*, 570 F.2d 286, 290 (8th Cir. 1978).

Analysis of the issues will be somewhat summary in this memorandum, in light of the material possibility that an order of the Court as to liability will enable the parties to agree on most if not all of the features of a remedial decree. If deemed appropriate, further findings of fact and conclusions of law will be handed down as a supplement to the present ruling.

At the time suits began to be filed, the most offensive and shocking prison condition was the locking of some inmates into small cells overnight or for even longer periods without operational toilet facilities, or with nauseating facilities. Most of the inmate population (averaging 81) is housed on eight tiers, two tiers to a floor, each of which contains an "inmate corridor" or day area measuring 6 by 50 feet and ten sleeping cells measuring 7½ by 5 feet. SPO No. 2 III.6; Stipulation of Parties. The sleeping cells originally contained operating toilets and all could be locked at night.

---

1. More than a dozen years ago, in response to argument that the State of Arkansas was "too poor" to provide acceptable means of prisoner discipline, Judge (now Justice) Blackmun wrote: "Humane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations."

The jail was designed to house approximately 200 inmates,[2] SPO No. 2 III.5, which would require double bunking in 37½ square foot cells. More recently, single bunking has been commonly used, but widespread plumbing failures (sometimes attributable to inmate sabotage) made it impossible to lock all inmates into cells with operational toilets. *E. g.*, Plaintiffs' Proposed Findings of Fact 12, 13.

After the first suit was filed it became Sheriff Gabriel's practice to keep the cells unlocked, thus generally affording eight to ten inmates separate sleeping cells in a multi-cell unit having an additional 300 square feet of space and at least one operational toilet. The major objection to this system is that it reduces security for the inmates, but the testimony indicates that the security problem is comparatively slight at the Buchanan County Jail. A separate maximum security unit exists in the jail, together with a women's unit, a juvenile unit, and a work release unit. On balance, the opening of sleeping cells was a desirable change, and essential where toilets were not operational or were in offensive condition.

The jail facility and its operational aspects continue to present a number of severe problems. The more serious complaints include: (1) almost total lack of physical recreational facilities because of inadequate staff to supervise trips to a large enclosed exercise yard, (2) limitations in availability of law books and general reading material, (3) marginal medical facilities and inadequate screening, (dental facilities limited to extractions), (4) some infestation by cockroaches, mice and rats, (5) questionable practices in food preparation and complaints of inadequate amounts of food and occasional unsanitary food trays, (6) some fire hazards (principally the danger of smoke from fires set by inmates) and electrical hazards, (7) inadequacies of bedding supplies and coveralls, especially when the population exceeds 80, (8) no organized barber service, (9) lack of known grievance procedures and procedures to review disci-

plinary measures, (10) rules and regulations which do not fully advise inmates of available rights and resources, (11) limited shower facilities (twice a week), (12) overheating in winter, (13) limited visiting opportunities (15 minutes per visit) and telephone calls (3 minutes) and (14) exclusion of pretrial detainees from religious programs and other programs because of staffing limits.

It may not be presently necessary to evaluate all the above issues, or to review the record to include some unmentioned additional points which may loom larger on further consideration. After noting several clear violations of rights under existing authorities a ruling of liability will now be handed down based on the "totality of conditions" approach. An opportunity will then be given the parties to propose remedial measures which are not excessively intrusive or wasteful of public funds but which need not necessarily match precisely the listed violations. As recently restated by one of the most authoritative judicial experts on prison conditions, " '(w)hen the totality of conditions in a penal institution violates the Constitution, the trial court's remedies are not limited to the redress of specific constitutional rights' ". *Smith v. Sullivan*, 611 F.2d 1039, 1045 n. 9 (5th Cir. 1980—Frank M. Johnson, Circuit Judge).

The "totality of conditions" approach to adjudication of prison cases has occasionally been questioned or rejected (*Wright v. Rushen*, supra, 1132–3) but seems currently to be accepted by the Supreme Court. In *Rhodes v. Chapman*, —— U.S. ——, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) the Supreme Court majority referred to Eighth Amendment violations arising from a "combination" of conditions (l.c. 2399), and the concurring justices referred specifically to the "totality of conditions" test (l.c. 2410). The judges of this district have relied on the "totality" approach, and it is generally my practice to accept local rulings which are not plainly foreclosed by subsequent appellate decisions. *Ahrens v. Thomas*, 434

---

*Jackson v. Bishop*, 404 F.2d 571, 580 (8th Cir. 1968).

**2.** The population of Buchanan County has decreased slightly from the level in 1910.

F.Supp. 873, 897 (W.D.Mo.1977), affirmed in part, mod. in part, 570 F.2d 286 (8th Cir. 1978); *Burks v. Walsh*, 461 F.Supp. 454, 481 (W.D.Mo.1978). Moreover, the Court of Appeals for the Eighth Circuit seems now to have adopted the "totality" test. *Villanueva v. George*, 659 F.2d 851 (Sept. 16, 1981).

Pursuant to this approach, the parties will be directed to meet, confer, and attempt to agree upon a remedial plan, which may be approved by the Court as a means of improving confinement conditions to at least a minimally constitutional level. See, *e. g., West v. Lamb*, 497 F.Supp. 989, 994–95 (D.Nev.1980). The parties are asked to offer their utmost cooperation and concrete proposals in devising feasible alternatives which will provide adequate relief. To provide some guidance as to what must be addressed by such a plan in order to comply with constitutional guidelines, some general areas of violations requiring remedial action will be reviewed. The statements herein should by no means be considered all-inclusive, but should be viewed only as a starting point by which the parties may gauge their efforts to complete a comprehensive plan. There are some conditions, however, which, even standing alone, are patently unconstitutional and will be ordered immediately remedied. Other flagrant violations in certain areas will be noted within the discussion as specific topics which the proposed remedial plan of the parties must include. In the interest of brevity, references will be made to those proposed findings which are adopted by the Court and to stipulations of the parties when possible, rather than reiterating each detail of fact.

While the unlocking of the cells has alleviated part of the problem of inadequate space for each prisoner, the jail continues to be overcrowded when the state of the plumbing, security problems, and lack of time off the tiers (with resulting multi-purpose use of the "common areas") are considered. SPO No. 2 III.18; Stipulation of the parties as to average population and cell size; Plaintiffs' Proposed Findings of Fact 12, 43, 83–92; Defendants' Proposed Findings of Fact 64c, 78a–d. The problem is compounded by and inextricably intertwined with the lack of adequate supervision, the fire hazards (particularly smoke inhalation) and the lack of sufficient cleaning and sanitizing of the tier and cell areas to make them more livable. SPO No. 2 III.12; Plaintiffs' 23, 24, 29–31, 34–37, 110, and Exh. 4; Defendants' 3a–d, 21e, 27b. All of these factors must be addressed, but at a minimum, no inmate should be assigned to a cell which is used as a communal toilet facility, and under present conditions only one inmate should be assigned to each of the usable cells on the tier. Adequate plans for classification, supervision and other increased security precautions necessitated by leaving the cells open should be made. No inmate shall be confined for more than one hour in any locked cell which does not have working plumbing. See *Flakes v. Percy*, 511 F.Supp. 1325 (W.D.Wis.1981). Stand-up cells are not to be used for confinement of prisoners at all, for any length of time.[3] It is possible that alternate uses could be found for that space. Provisions must be made for more effective cleaning of cells, plumbing facilities, and tier areas, including thorough sanitizing of toilets on a regular basis, whether by inmates or otherwise, to prevent further rodent and insect infestation, the spread of disease, and foul odors to the extent possible. Several suggestions were made by witnesses as to possible improvements of wiring and other factors contributing to fire hazard, which the parties should consider, and there are several possible means for improving the lighting (particularly during daylight hours) within cell areas.

---

**3.** There is at least one undisputed recent incident of a prisoner confined to a stand-up cell overnight, without clothing, following his attempted suicide. See Defendants' Exh. 14D. Jail personnel attempted to explain this incident as letting him "cool off" and being for his own protection. Either of those purposes, though worthwhile and necessary, must be accomplished in a humane manner. It would seem that the staff is aware of this mandate, as initial denials of any use of the stand-up cells were made before this specific incident was brought to light at trial. See also Plaintiffs' 104–06.

There was no evidence as to the nutritional values of the food now served to inmates. There was an indication that the quality (but not the quantity) of the food had improved since the hiring of a part-time cook in January of this year. One "horror story" recounted an occasion when the cost-conscious cook continued to use left-over bread which she had been saving for bread pudding, but which had become infested by cockroaches. The insects had presumably been removed prior to using the bread. Jail trusties, serving as kitchen assistants, spread the word that the dessert for the day was "cockroach pudding." Inmates and former inmates complained that inadequate amounts of food were supplied, and there was uncontradicted testimony that more food was supplied at the State penal institutions (although Missouri state institutions have been noted as having one of the lower budget allocations per inmate in the country). There also appears to be a need for a more adequate system to ensure cleanliness of food trays and utensils in order to eliminate food particles prior to reuse, and to require any trusty who works in the kitchen area to observe higher standards of personal cleanliness and hygiene and to wear hair coverings as a condition of the privileges accorded trusties. See generally, SPO No. 2 III.19, 26; Plaintiffs' 59–62, 64; Defendants' 22a–b, 37a–b, Exh. 7.

In *Campbell v. Cauthron*, 623 F.2d 503 (8th Cir. 1980), the Court of Appeals for this Circuit required that the prison officials in Fort Smith, Arkansas provide inmates with "a meaningful opportunity for exercise" for "at least one hour per day" under the conditions there described. *Id.* at 507. Although the *Campbell* decision was handed down during the pendency of this litigation, and has been on the books for more than a year, Buchanan County has made no move to increase the staffing of its jail to comply with the constitutional requirement that inmates be protected against "the detrimental physical consequences of enforced idleness in a small living space." l.c. at 507.[4] SPO No. 2 III.21–22; Plaintiffs' 120–21.

Even more excruciating, from a physical standpoint, is the county's "policy" of ignoring painful dental conditions, unless the inmate is willing to submit to the extraction of a tooth at county expense, or has the resources to employ a local dentist for an emergency filling. While it is by no means unprecedented for an old-fashioned prison regime to offer tooth extraction as "the only dental care" (*Taylor v. Sterrett*, 344 F.Supp. 411, 414 (N.D.Tex.1972)) no case has been found where such a limitation has been deemed judicially tolerable. Lexis research discloses one case in which a specific order was entered (not contested on appeal) to supply personnel and equipment "sufficient to fill cavities, relieve pain, and provide emergency dental care ..." Unreported detailed order of July 17, 1975, in *Miller v. Carson*, 401 F.Supp. 835 (M.D.Fla. 1975), affirmed in part and modified in part (not here relevant), 563 F.2d 741 (5th Cir. 1977). The unmet need for emergency dental fillings, reflected with some frequency in the nurse's sick call records, Plaintiffs' Exh. 16, clearly violates the requirement that reasonably adequate medical care be supplied to persons in custody. 563 F.2d at 752 n. 21.

Moreover, any remedial plan must include provisions for medical screening to prevent the spread of disease and to ensure that any patients who are ill or who otherwise require it are promptly given treatment and medication. This screening should be an integral part of the initial screening given all inmates, which should also include writ-

4. This Court believes that prison and jail authorities have an equal duty to provide opportunities for mental exercise, and should seek to offer reading and writing materials stimulating to self-improvement and to prevent "enforced idleness" of mental powers. Protection against "physical degeneration" is required by the *Campbell* decision; prison authorities would also seemingly have an obligation to prevent mental degeneration during confinement. The jail's present nonlegal library (not shown to the Court) is apparently not only deficient but is open only to male prisoners leaving the shower room. Improvement in reading opportunities for all prisoners can doubtless be provided with minimal effort and expense. Service organizations could perhaps assume this responsibility.

ten notification of jail rules, policies and procedures, issuance of clean and adequate bedding, provision of hygiene items to those who do not have them, and allowance for prompt showers and clean clothing. "Standing orders" or other written procedures for provision of medical treatment (removing the wide discretion now allowed nonmedical personnel) should be established. See (as to current procedures) SPO No. 2 III.29, 30; Plaintiffs' 38–41, 52–56, 65–79, 81–82; Defendants' 42a, 43a, 44a–b, 47a–c.

■ Inmates who are to appear in court must be allowed the opportunity to do so in clean clothing, to take a shower, to obtain a haircut (at county expense unless funds are on deposit) and to shave if requested, so as not to be denied their right to be present in the courtroom free of a "prisoner stigma." Defendants are also encouraged to improve the regular opportunities for shaving, showering, and other personal hygiene, to improve the health, living environment, and, if nothing else, morale among the inmates, although it cannot be said that the twice-weekly shower system, in itself, is a denial of specific rights. SPO No. 2 III.13–17, Plaintiffs' 47–56. While convicted inmates are not constitutionally entitled to be freed from conditions which are merely "uncomfortable" (*Rhodes*, supra, 101 S.Ct. at 2400), pretrial detainees may not be subjected to conditions which may be considered punitive. If it is not feasible to separate inmates, the solution would appear to be to allow all inmates the rights of detainees.

Access to the "outside" should be improved. High among factors to consider are more readily accessible legal materials or assistance, with information distributed to the prisoners as to how this is available, and less restrictive provisions for visitation and telephone calls, particularly to counsel, although this may be within the confines

necessary to preserve the security of the institution. Provisions shall be made to enable all prisoners to obtain writing materials and stamps. All programs provided shall be open equally to pretrial detainees, unless the length of their confinement prohibits meaningful participation (*e. g.*, a study course which could not be completed within the period of confinement). Religious services and other meetings shall be open to all inmates except as prohibited by justified security measures, and all reasonable requests for visits from any clergy allowed. SPO No. 2 III. 24–25; Plaintiffs' 9, 93, 95, second 96, 114–16, 118, 122; Defendants' 34b, 56a–b, 58a–b, 61a.

Grievance procedures must comport with established authority on due process requirements. See *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) and cases cited therein at 544, 556–58, 94 S.Ct. at 2969, 2974–75. Prisoners should be informed, in writing, upon initial screening, of disciplinary procedures as well as grievance procedures and the mechanisms established for pursuing them and for appeals.[5] Plaintiffs' 98–104.

Further detailing of specific conditions does not appear necessary, as counsel have recognized other issues in their proposed findings and it can be assumed that each will be considered in the proposed remedial order which will be prepared. It may also be assumed that counsel will consider applicable portions of the remedial order adopted February 27, 1981, in the Clay County case. See *Hutchings v. Corum*, 501 F.Supp. 1276 (W.D.Mo.1980).

To conclude, comparison of this jail with others shows it to be an inferior example of a class of public facility which experience has shown to be constitutionally suspect. The jail was described by one of the defendants, a former chief deputy sheriff with experience as an inspector of federal facili-

---

5. One of the most serious problems at the jail appears to be lack of communication between the administration and the inmates. Access to law books is an illustration. While it is said that inmates may, on request, conduct legal research at the county prosecutor's office, such a policy is apparently unknown to inmates. One may suspect that the administration has been fearful of publicizing this policy, because the current insufficient staff would not be able to cope with a studious jail populace. The right exists, however; it must be met in some manner; and availability of current law books cannot properly be kept secret.

ties, as the dirtiest he had inspected. Plaintiffs' principal expert witness, a consultant who had toured hundreds of penal institutions, testified that the jail was a better facility than many county jails in small communities, but is in the bottom 10% of comparable sized facilities he has observed.

It should be noted, for balance, that there was little criticism of jail deputies. One of plaintiffs' witnesses referred to the matron as "an angel" and one of the plaintiffs testified that the deputies were generally "a bunch of good guys for what they know." Similarly, the inmates were described as "generally well behaved." A defense witness, now an inmate in the jail, testified that conditions were considerably better than in small jails in which he has been an inmate, and were also "much better" than conditions in the Jackson County jail (Kansas City) where he was committed in 1969 or 1970.[6]

█ Defendants will not be surprised, however, that the Court must conclude that the totality of conditions at the Buchanan County jail violates the Eighth Amendment rights of convicted prisoners and the Due Process rights of pretrial detainees. Conditions are somewhat inferior to those described and condemned by the Court of Appeals in the *Campbell* case, relating to the comparatively new facility in Fort Smith, Arkansas.

Having toured the jail and carefully evaluated the testimony, it is concluded that the jail is not wholly inoperable, from a constitutional standpoint, and need not necessarily be closed. Authorization of a new jail by the voters of Buchanan County might not only be desirable, however, but less expensive in the long run. But improved physical facilities would be only part of the price that must be paid for acceptable jail operations, under current court decisions. Funding of adequate administration would still

be needed in a jail which met all desirable modern design standards.

Accordingly, it is hereby

ORDERED that the parties shall, within thirty (30) days of the date of this Order, meet, confer, and attempt to agree upon an adequate remedial order in accordance with the above Memorandum Opinion to eliminate unconstitutional conditions of confinement. All agreed proposals and such further requests as plaintiffs deem necessary[7] shall be submitted to the Court within sixty (60) days of the date of this Order for approval (with addition by the Court of any measures not included but deemed necessary). It is further

ORDERED that until entry of a more comprehensive order defendants are enjoined from the following:

1) Confining more inmates to a tier than can be accommodated by assigning only one inmate to each cell, with no inmate assigned to a cell used as a communal toilet facility;

2) Using stand-up cells for confinement of any inmates for any period of time;

3) Confining any inmate for longer than one hour in any locked cell which does not have working plumbing;

4) Restricting any inmate (except for abnormal health or security reasons, reduced to writing) to less than three hours per week of physical exercise outside the tier on which he or she is confined, to be increased to a minimum of seven hours per week within sixty (60) days of the date of this Order;

5) Excluding any inmate from any religious activity or other authorized meeting without written findings of health or security reasons for doing so.

Such increases in staff as may be necessary to carry out this Order shall be made without limitation imposed by State law.

---

**6.** The Jackson County jail has been and is the subject of subsequent litigation and consent decrees.

**7.** Plaintiffs should confine their requests to the moderate limits which the Court will likely approve, without waiver of rights, in the event of

an appeal, to challenge the sufficiency of the general principles here established. If one or more conferences with the Court would be helpful, the parties should make an appropriate request.

The Court retains jurisdiction for the period necessary to ensure compliance with this decree, to make any further findings and conclusions necessary following submission by the parties of proposed remedial measures, and to enter any further orders necessary to full relief.