**Robert CAMPBELL, Plaintiff,**

v.

**Dennis THORNTON, d/b/a Agape House, and Diane Thornton, Dick D. Moore, Individually and as Chairman of the Probation & Parole, State of Missouri, David Blackwell, Individually and as Director of the Department of Correction & Human Resources of Missouri, Defendants.**

No. 84–4247–CV–C–5.

United States District Court, W.D. Missouri, C.D.

Aug. 4, 1986.

Roger J. Schuber, Andrew C. Webb, Sedalia, Mo., for plaintiff.

David R. Smalley, Paul R. Shy, Kansas City, Mo., for Thorntons.

Paul J. Oldenburg, Jr., Brooks Pitchie, Office of Atty. Gen., Jefferson City, Mo., for Moore and Blackwell.

## ORDER

SCOTT O. WRIGHT, Chief Judge.

Pending before the Court in this civil rights action are various post-trial motions. For the reasons set forth below, the Court will make the following rulings; (1) plaintiff's motion to amend the pleadings to conform to the evidence will be overruled; (2) defendants' motions for J.N.O.V. on the punitive damages issue will be sustained; and (3) in all other respects, defendants' motions for J.N.O.V. and alternative motions for a new trial will be overruled.

### I. *Background*

Robert Campbell, the plaintiff herein, is a young man who hails from Sedalia, Missouri. His father, Dr. A.J. Campbell, is one of the leading physicians in Sedalia. Unfortunately, Robert Campbell is the black sheep in the Campbell family. He has a history of getting into trouble. In December of 1980, he was found guilty of stealing and was placed on probation. Soon thereafter, he broke his probation by driving while intoxicated. He spent thirty days in the Pettis County Jail and was next placed in an alcohol treatment program at the Valley Hope Hospital. As the final stage of his rehabilitation, Robert Campbell was placed in the Agape House, a state-sponsored halfway house in Sedalia.

Dennis and Diane Thornton, husband and wife, are the defendants herein. At all relevant times, the Thorntons ran the Agape House. At any given time, there were approximately ten young men sentenced to the Agape House.

According to the plaintiff's evidence, the Thorntons were religious fundamentalists who forced their religious views on the residents of the Agape House.[1] In addition, there was evidence that the Thorntons censored the residents' incoming and outgoing mail, and also regulated the television-viewing and radio-listening habits of the residents.[2] Finally, the plaintiff presented evidence to substantiate his claim that defendant Diane Thornton forced plaintiff to have sex with her by threatening to send him back to jail if he did not comply.[3]

---

1. Several former residents of the Agape House, including the plaintiff, testified that they were forced to attend the Thorntons' fundamentalist church every Sunday and were forced to attend Bible study every day. These witnesses testified that the Thorntons threatened to send them back to jail if they refused to attend church and Bible study. In addition, these witnesses testified that they were prevented from attending the churches of their choice. For example, James Kempf testified that he was not allowed to attend Catholic Church with the rest of his family because the Thorntons disliked Catholics. Similarly, the plaintiff testified that he was not permitted to attend church with his family but instead was forced to attend the church of the Thorntons' choice.

2. Several of the Agape House residents, including plaintiff, testified that the Thorntons would not allow them to listen to country-and-western or rock-and-roll music because the lyrics were filled with references to sex, drugs, and alcohol; instead, they were only permitted to listen to gospel music and other religious programming. Similarly, several witnesses testified that the Thorntons would not allow plaintiff and other Agape House residents to watch certain television shows, such as: MASH (because Corporal Klinger dressed in women's clothes); Solid Gold (because of the shows' sexually suggestive dancing); Love Boat (because of the bikini-clad women on the show); and WKRP in Cincinnati (because of Loni Anderson).

3. The plaintiff testified quite bluntly that he and Mrs. Thornton had enjoyed a sexual relationship for some time. At first, it was a mutually agreeable arrangement. After a while, however, plaintiff wanted to terminate the relationship. At that point, he testified, Diane Thornton used her official power and forced him to continue the liaison by threatening to send him back to jail if he did not comply.

Although no one could corroborate plaintiff's testimony concerning Diane Thornton's alleged threats to send him back to jail, three witnesses did confirm that plaintiff was involved in a sexual relationship with Diane Thornton. Plaintiff's first witness, Benny Hunter, testified that he had noticed an unusually close relation-

Based on this evidence, plaintiff submitted four claims to the jury: (1) violation of his right to religious freedom; (2) violation of his right to send and receive mail; (3) violation of his right of uncensored access to media; and (4) violation of his right to bodily privacy.

The Thorntons categorically denied each of plaintiff's claims. Specifically, the defendants denied forcing their religious views on residents of the Agape House, denied censoring their mail, and denied interfering with their radio-listening and television-viewing habits. Significantly, the defendants did not admit engaging in these activities but doing so for the purpose of rehabilitating the halfway house residents. Finally, defendant Diane Thornton categorically denied any sexual involvement with plaintiff, much less forcing plaintiff to continue in such a relationship.

Thus, the battle lines were clearly drawn. Each of plaintiff's four constitutional claims was submitted to the jury. The jury found for plaintiff on each claim and awarded damages in the following amounts: (1) on plaintiff's religious freedom claim, $5,000.00 actual damages and no punitive damages against either defendant; (2) on plaintiff's mail censorship claim, $1,000.00 actual damages, $3,500.00 punitive damages against defendant Dennis Thornton, and $1,500.00 punitive damages against defendant Diane Thornton; (3) on plaintiff's media censorship claim, $1,000.00 actual damages, and $3,000.00 punitive damages against each defendant; and (4) on plaintiff's right to bodily privacy claim, which was submitted against defendant Diane Thornton only, $2,000.00 actual damages, and $5,000.00 punitive damages.

## II. *Discussion*

■ The first issue before the Court is whether plaintiff is entitled to keep the jury's punitive damage awards or whether he is precluded from recovering punitive damages by reason of his failure to include a prayer for such relief in his complaint.[4] Plaintiff has sought to rectify this omission by filing a motion to amend the pleadings to conform to the evidence. This motion will be overruled because the Court finds that defendants would be severely prejudiced by such an amendment at this late date. In addition, the defendants' motions for J.N.O.V. on the punitive damage awards will be sustained for the reason that plaintiff failed to allege an adequate basis for the recovery of punitive damages in his complaint. It bears emphasis that the complaint herein did not contain a prayer for punitive damages *nor* did it even allege that the defendants had acted willfully, maliciously, or with callous disregard for the plaintiff's rights. Under these circumstances, the Court is obliged to hold that defendants did not have fair notice of plaintiff's intention to seek punitive damages. *See* Fed.R.Civ.P. 8(a), (e); Fed.R. Civ.P. 9(b), (g); *Nagel v. Prescott & Co.*, 36 F.R.D. 445, 449–50 (N.D. Ohio 1964); *Olson v. Shinnihon Kisen K.K.*, 25 F.R.D. 7, 9 (E.D.Pa.1960). Therefore, the punitive damage awards herein must be set aside.

■ The second issue before the Court is whether there is sufficient evidence to support the jury's findings of liability and actual damage awards. On this issue, the

ship between Diane Thornton and plaintiff. On one occasion, Mr. Hunter related, he was picked up from work by plaintiff and Mrs. Thornton, and noticed that the truck seemed unusually hot and sweaty and that there was a large wet spot on the front of the plaintiff's trousers. Along the same lines, James Kempf testified that he once had walked into plaintiff's room at the Agape House and had seen plaintiff and Diane Thornton engaged in sexual intercourse. Finally, Merlie Smith testified that she had seen Diane Thornton remove her blouse and flaunt

herself before plaintiff in the kitchen of the Agape House.

4. At trial, defendants made a timely objection to the submission of the punitive damages issue to the jury. Although the Court was inclined to sustain defendants' objection at that time, it was decided that no harm could be done by allowing the jury to pass on the punitive damages question while reserving the right to determine whether the punitive damages issue had been properly raised in the first place.

Court must rule in favor of plaintiff. Initially, the Court notes that each of plaintiff's claims had a sound legal basis.[5] In addition, the Court observes that this case boiled down to a credibility dispute: on the one hand, the plaintiff and his witnesses presented substantial evidence concerning each of the plaintiff's claims; on the other hand, the defendants categorically denied each of plaintiff's allegations. This dispute was ideally suited to resolution by a jury. Finally, the Court notes that the jury instructions properly submitted the essential elements of each of plaintiff's claims.[6] Consequently, there is no basis for second-guessing the jury's verdicts. Therefore, on the issues of liability and actual damages, defendants' motions for J.N.O.V. and alternative motions for a new trial must be overruled.

In accordance with the foregoing, it is hereby

ORDERED that plaintiff's motion to amend the pleadings to conform to the evidence is overruled. It is further

ORDERED that, on the issue of punitive damages, the defendants' motions for judgment notwithstanding the verdict are sustained. It is further

ORDERED that the judgment herein is amended as follows: (a) on plaintiff's religious freedom claim, the defendants are jointly and severally liable for $5,000.00 in actual damages and no punitive damages; (b) on plaintiff's mail censorship claim, the defendants are jointly and severally liable for $1,000.00 in actual damages and no punitive damages; (c) on plaintiff's media censorship claim, the defendants are jointly and severally liable for $1,000.00 in actual damages and no punitive damages; and (d) on plaintiff's right to privacy claim, defendant Diane Thornton is liable for $2,000.00 in actual damages and no punitive damages. It is further

ORDERED that, in all other respects, defendants' motions for J.N.O.V. and alternative motions for new trial are overruled.

5. *See Owens v. Kelley*, 681 F.2d 1362, 1365 (11th Cir.1982) ("it is clear that a condition of probation which requires the probationer to adopt religion or any particular religion would be unconstitutional"); *Campbell v. Cauthron*, 623 F.2d 503, 509 (8th Cir.1980) (forced religious inculcation of state prisoners violates Free Exercise Clause of the First Amendment); *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 1809–12, 40 L.Ed.2d 139 (1974) (censorship of inmate correspondence is justified only if such censorship is reasonably related to legitimate governmental interests of security, order, and rehabilitation); *Thibodeaux v. South Dakota*, 553 F.2d 558, 559–60 (8th Cir.1977) (content-based media censorship by prison officials is justified only if related to legitimate governmental interests of security, order, and rehabilitation); *Carpenter v. South Dakota*, 536 F.2d 759, 762 (8th Cir.1976) (same); *Morgan v. LaVallee*, 526 F.2d 221, 224–25 (2d Cir.1975) (same); *Garnett v. Kepner*, 541 F.Supp. 241, 243 (M.D.Pa.1982) (plaintiff's civil rights were violated by prison guard who forced her to engage in sexual intercourse by threatening to take disciplinary action against her).

6. The verdict directors on plaintiff's religious freedom claim posited three essential elements: (1) that the defendant prohibited plaintiff from practicing the religion of his own choosing or forced plaintiff to accept a particular religious doctrine against his will; (2) that, in so doing, the defendant was acting under "color of law" as that term was defined in a separate instruction; and (3) that the defendant's actions were not reasonably related to maintaining security at the Agape House.

The verdict directors on plaintiff's mail censorship claim also posited three essential elements: (1) that the defendant censored plaintiff's mail; (2) that, in so doing, the defendant was acting "under color of law"; and (3) that such censorship was not necessary or essential to further the legitimate governmental interests of security, order, or rehabilitation.

The verdict directors on plaintiff's media censorship similarly posited three essential elements: (1) that the defendant prohibited plaintiff from watching certain television shows or listening to certain radio programs because of the content of such shows or programs; (2) that, in so doing, the defendant was acting under "color of law"; and (3) that such regulation of plaintiff's television-viewing or radio-listening was not necessary or essential to further the legitimate governmental interests of security, order, or rehabilitation.

Finally, on plaintiff's right to privacy claim, the verdict director submitted two essential elements: (1) that defendant Diane Thornton forced plaintiff to have sex with her against his will by threatening to send him to jail if he did not comply; and (2) in so doing, defendant Diane Thornton was acting "under color of law."