James **BENJAMIN, Miguel Galindez, Bruce Hayes, Jose Saldana and Robert Eschert, detainees of the New York City House of Detention for Men, individually and on behalf of all other persons similarly situated, Plaintiffs,**

v.

**Benjamin J. MALCOLM, Commissioner of Correction of the City of New York; Arthur Rubin, Warden, New York City House of Detention for Men; Gerard Brown, Deputy Warden, New York City House of Detention for Men; and Abraham D. Beame, Mayor of the City of New York, individually and in their official capacities, Defendants.**

No. 75 Civ. 3073 (MEL).

United States District Court, S. D. New York.

Aug. 27, 1980.

William E. Hellerstein, Theodore H. Katz, John Boston, Michael B. Mushlin, Amy Rothstein, The Legal Aid Society Prisoners' Rights Project, New York City, for plaintiffs.

Allen G. Schwartz, Corp. Counsel, New York City, for defendants; Leonard Koerner, Paul T. Rephen, Asst. Corp. Counsels, New York City.

LASKER, District Judge.

The House of Detention for Men on Rikers Island (HDM) is presently the exclusive [1] facility used for pre–trial detention of men who are charged with crimes occurring in New York County. HDM is adjoined by and connected to two other facilities for detention of men known, respectively, as C71 and C95. Collectively they are referred to below as "the Complex." In June 1975, this civil rights suit was instituted on behalf of all pre–trial detainees at HDM. The complaint alleges that the conditions under which the plaintiffs are held are constitutionally impermissible. Trial began in October 1976 and was concluded in the Spring of 1977.

In January 1978, a new mayoral administration book office in New York City. In contrast to its predecessor its policy was to dispose of the issues raised in this litigation (and a number of other cases which attacked conditions in other city detention facilities) by negotiation or settlement if possible. Accordingly, the parties requested that the court withhold determination of the issues then pending. An order incorporating their agreement to negotiate was entered March 2, 1978.

Thereafter, and apart from this suit, the City and the State of New York began discussions for the lease of Rikers Island to the State. On September 28, 1979, the parties to this suit entered into a "Stipulation for Entry of an Order," the relevant terms of which provided that a purpose of the Stipulation was "to secure plaintiffs' rights to be housed under constitutional conditions." The Stipulation specified alternate dispositions of the case depending on whether the lease of Rikers Island to the State materialized. That lease has failed of consummation, and accordingly the now operative terms of the Stipulation provide that:

"4. In the event that an agreement for the transfer of the detention facilities on Rikers Island to the State is not concluded by December 1, 1979:

\* \* \* \* \* \*

b. The parties agree that the Court may proceed to the entry of judgment which contains the appropriate remedies for the conditions described by the facts agreed upon below, in subparagraph c;

c. To that end, the parties agree:

(1) that the record in *Benjamin v. Malcolm* established plaintiffs' factual claim that, at the time of trial,

f. The housing blocks at HDM and the institution at large were overpopulated; such overpopulation resulted in an atmosphere of tension and hostility, a strain on all of the institution's facilities, and interference with supervision, protection and provision of services to members of the plaintiff class.

(2) Plaintiffs are entitled, as a matter of law, to the entry of a judgment remedying the conditions described in paragraph (1) above;

---

1. HDM is operated by the City of New York and is one of a group of detention facilities which include the Bronx, Queens and Brooklyn Houses of Detention for Men, as well as a Women's House of Detention and Adolescent Remand Shelter and other facilities on Rikers Island. In normal circumstances, men charged with offenses in the Bronx, Queens or Brooklyn are detained in facilities in those counties and those charged with offenses occurring in New York County are housed in HDM. However, as is the case in any multi–facility correctional system, prisoners or detainees are occasionally transferred from one facility to another for security or administrative reasons.

(3) That plaintiffs reserve the right to litigate the issue of the appropriate remedy for the conditions described in paragraph (1), prior to the entry of judgment, and to contest, on appeal, the specific terms of any final remedy ordered by the Court."

The plaintiffs now move for a judgment "granting relief for unconstitutional overcrowding" at HDM and ask that the City be required to reduce the facility's population to 1,000.[2]

## I

The plaintiffs contend that since the City conceded by the 1978 Stipulation and Order that HDM was constitutionally overcrowded at the time of the 1976 trial, and since the population is higher today than it was then, the plaintiffs are, by the terms of the Stipulation, automatically "entitled, as a matter of law, to the entry of a judgment remedying the conditions" at hand, and that the sole issue before the court is what the remedy should be.

They recite a long history of studies of HDM by public and quasi public bodies, all of which have concluded that HDM has been dangerously overcrowded for years and have recommended that its population be stringently reduced. For example, in June 1975, the Board of Correction of New York City–the body established by law as a watchdog of conditions in City jails–issued a report, detailing the problems which then resulted from overcrowding at HDM and concluded that "excessive over crowding creating an environment that is in a perpetual state of emergency" was a major cause of increased tensions. (Board of Correction Report on the New York City House of Detention for Men, June 1975).

The Board's analysis was proven too truly correct when in the fall of 1975, a major riot occurred at HDM causing millions of dollars of physical damage and endangering the lives of several Correction officers who were taken as hostages. In reporting to the then Mayor on the riot, the Commissioner of Correction stated that "perhaps the most singularly causative factor in the House of Detention for Men's explosion was overcrowding coupled with staff shortages and the delay in processing inmates for trial."

In a "Staff Report of the State Commission of Correction," dated March 30, 1977, it was concluded (at pp. 50–51) that when the institutional population exceeds 1,000 "racial tension and interpersonal problems begin to develop." The State Commission of Correction is charged by statute to "[p]romulgate rules and regulations establishing minimum standards for the care [and] custody . . . for all persons confined in correctional facilities," N.Y.Correc.Law § 45(6) (McKinney Cum.Supp.1979–1980), and has the responsibility to "[c]lose any correctional facility which is unsafe, insanitary or inadequate," id. § 45(8). (The statutory definition of "correctional facilities" includes New York City's correctional facilities.)

At the trial of this case, Louis Greco, then Warden of HDM, testified that the number of serious incidents and the breakdown of services increased "disproportionately" as the population of the jail rose above 1,000 (Trial Transcript, 1929–31, 1939–40).

In the Spring of 1977, the State Commission, reacting to what it described as a "dangerous situation" (Letter of State Commission to Benjamin Malcolm, Correction Commissioner of the City of New York), entered into an agreement with the City by which the population at HDM was to be reduced to 1,200–although the State Commission staff recommended a level of 1,000 (Commission Staff Report, p. 56).[3]

---

**2.** The notice of motion does not specify a proposed level of population, but the affidavit of Theodore M. Katz in support of the motion indicates that the plaintiffs maintain that the population at HDM "be reduced to a maximum of 1,000 and that the population in the 240–cell blocks should not be permitted to exceed 140."

**3.** On June 22, 1977, the Correctional Association of New York wrote to Governor Carey and then Mayor Beame, stating that:

"[m]embers of the Board have been at HDM . . . during the hot summer months and know what overcrowding does to prisoners and custodial personnel. We believe you are

The City failed to comply with the agreement. Accordingly, the State Commission by directive of September 21, 1977, ordered the City to reduce HDM population to 1,200. In doing so, it observed in a covering letter of that date that:

"A population in excess of 1,200 prisoners at HDM militates against proper sanitation and cleanliness at HDM–and poses a threat to the safety, security and well being of persons employed at or incarcerated in HDM."

The City again failed to comply, with the result that the State Commission then moved in the Supreme Court of the State of New York for an order requiring compliance.

On June 9, 1978, the State Commission withdrew its motion. The Attorney General of New York, in a letter to this court of that date, stated that the primary reason for the withdrawal was "that the City has substantially complied with the relief sought. The HDM population has been reduced to 1,200 (excluding the allowable exceptions)."

The alleviation was short lived, however, and population has been at a higher level ever since. For example, on July 13, 1979, then Commissioner Ciuros was quoted in the New York Times as reporting that there were 2,027 inmates in the HDM Complex. In October of 1979, the defendants themselves asserted that HDM was "in extremely decrepit condition which threatens the health and safety of both staff and inmates" and set an objective of a 900 man population if Rikers Island were not leased to the State (Rikers Island Project Working Document, October 1, 1979, at 25–26).

Finally, in April of this year, the New York City Board of Correction described HDM as suffering from "deteriorating conditions caused by overcrowding," with a population "hovering" about 1,500, and a total population of the Complex at 2,400.

Plaintiffs assert that on this factual record the court has the authority and responsibility to order a reduction in population at HDM. It relies on a long line of cases in which such relief has been granted, and in particular, in this circuit such decisions as *Detainees of the Brooklyn House of Detention for Men v. Malcolm*, 520 F.2d 392 (2d Cir. 1975); *Ambrose v. Malcolm*, 414 F.Supp. 485 (S.D.N.Y.1976); and *Benjamin v. Malcolm*, 75 Civ. 3073 (S.D.N.Y., Nov. 18, 1975).

The City does not dispute any of the facts cited above, nor that the present population of HDM is greater than it was at the time of trial. It opposes the motion on the grounds that improvements have occurred in conditions other than the level of population at HDM, that the constitutionality of population levels must be determined on the basis of the totality of the circumstances now obtaining, and that the decision of the United States Supreme Court in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), precludes the court from granting the relief requested.

In particular, the City points out that inmates enjoy daily recreation today in contrast to a lack of weekend recreation at the time of trial; the program of outdoor recreation has been expanded; improved visiting facilities have been created and evening visits newly initiated; food is more timely served; roof leakages have been repaired; access to telephones and the law library have been increased; inmates are now transported to court detention facilities for conference with counsel; inmates are now allowed to receive packages by mail and are permitted a wider variety of items; inmates are escorted to family events for a wider range of relatives; Spanish and English newspapers are provided daily; an inmate may be housed at a borough house of detention during his trial; those who need special observation are housed on a special tier; lexan utensils and trays, substituted for metal, reduce noise at meal time; buses rather than vans are used; and an Inmate Grievance Resolution Program has been in-

both well aware of how explosive such conditions can become.

\* \* \* \* \* \*

Will you please put the imagination and resources of your offices on this problem before it is too late?"

stituted. (Affidavit of Benjamin Ward, Commissioner of Correction, in opposition to the motion).

Moreover, the City points out that the problem of overcrowding at HDM has been substantially affected by the City's obligation to house newly convicted State prisoners who have not yet been placed in State prisons, as well as State parolees who are charged with violation of parole. On July 17, 1980, there were 657 such convicted prisoners and 140 alleged violators in custody at the HDM Complex. So serious is this aspect of the problem that on April 2, 1980, the City Commissioner of Correction discontinued acceptance of "technical parole violators," only to find that the State responded by increasing the number of newly convicted prisoners which it assigned to HDM.

■ The City is entitled to understanding on account of the aggravation of its burden caused by the injection into its correctional facilities of such a large number of State prisoners. Yet the ultimate fact of unconstitutional overcrowding remains the same whether it is caused entirely or only partly by the presence of City detainees. It is the City's obligation to provide minimally acceptable population levels for those in its custody, and even the City does not argue that it can be freed of that obligation because the present condition is significantly affected by the necessity to house State prisoners.[4]

As indicated above, the City argues that these changes in the totality of the circumstances since trial—and in some cases since the date of the Stipulation—are such that the court, if it has authority to grant relief, should not do so. Moreover, the City contends that, in the present circumstances of this case, *Bell v. Wolfish, supra,* bars granting such relief.

## II

At the time of trial, the population of HDM proper was about 1,350 and the other buildings of the Complex housed a number which ranged between 100 and 250. Today HDM's population is somewhat in excess of 1,500, and the Complex houses a total of 2,400. The level of the population of the Complex as a whole is relevant because the various buildings share important common services, including those of a necessarily limited number of correction officers and support personnel. Yet even if the population outside HDM is disregarded, it remains the fact that the level at HDM itself is more than 15% greater than it was at the time of trial, and the City has stipulated that even at the trial date level, HDM was unconstitutionally overcrowded.

Accordingly, unless the change in conditions since the trial catalogued above (or the date of the Stipulation) is such as to remove the foundation of the Stipulation (and unless *Bell v. Wolfish* bars relief, a subject discussed below), the question before the court would not be whether relief ought to be granted but what that relief should be.

There can be no doubt that although the City has failed even to maintain HDM's population at trial–date levels, it has made valiant efforts to improve conditions there. Indeed, the present City administration deserves sound praise for its humane, constructive and cooperative attitude towards the care of inmates in its custody. This cannot be said of earlier administrations, and the current actions of the City (including the offices of the Mayor, the Corporation Counsel and the Correction Commissioner), have resulted in the resolution of many disputed matters for which inmates, the public and the court must be grateful. It is equally true that a number of the improvements which have occurred may well tend to ease the oppressive conditions which overcrowding causes—although some obviously do not.

---

4. During the course of the drafting of this opinion, the City has filed a motion for an order joining the Governor of the State and the State Commissioner of Correctional Services as defendants in this action so that the City may request relief from this court on account of the problem caused to it by the housing of state convicted prisoners and alleged parole violators at the HDM.

■ Yet, granting full credit for the amelioration which has taken place, the record simply does not establish that the state of affairs stipulated to exist at a population level of 1,350, much less at more than 1,500, has been significantly diminished, and it certainly has not been overcome. Longer and more frequent periods of recreation, visiting, access to telephones and the law library, less noise at meals and other new policies mentioned above can reasonably be believed to better the life of an HDM inmate, but they cannot be said to have erased the stipulated proposition that:

> "The housing blocks at HDM and the institution at large [are] overpopulated. Such overpopulation [results] in an atmosphere of tension and hostility, a strain on all of the institution's facilities, and interference with supervision, protection and provision of services to members of the plaintiff class." [5]

■ Since the City asks that it be relieved of the obligations specified in the stipulation and order, it has the burden of establishing that the change in circumstances justifies such a course. *United States Steel Corp. v. Fraternal Association of Steel Haulers*, 601 F.2d 1269, 1274 (3d Cir. 1979); *see United States v. Swift & Co.*, 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932). It has not done so.

Moreover, it is an undisputed fact that extra spaces exist within the buildings of the Complex other than HDM which can physically accommodate the 300 or so inmates who would have to be moved from HDM to reduce the population to 1,200. The obstacle to their removal is not space,[6] but that security arrangements in the space available are, according to the City, not equal to those at HDM, and that the neces-sity to improve security at the other buildings will cause additional cost.

Without minimizing the desirability of not adding to the City's financial problems, it is nevertheless fair to point out in this connection that the present existence of physical space drastically reduces the cost that the city would otherwise be required to incur, that that cost may be further reduced by the use of a system of classification which would remove to other buildings only those inmates who need not be housed in maximum security conditions and that the decisions of the courts are legion that cost burden is not a defense to the deprivation of constitutional rights. *See*, for example, *Campbell v. McGruder*, 580 F.2d 521, 540 (D.C. Cir. 1978); *Turpin v. Mailet*, 579 F.2d 152, 165 n.38 (2d Cir. 1979); *Battle v. Anderson*, 564 F.2d 388, 395–96 (10th Cir. 1977); *Detainees of Brooklyn House of Detention for Men v. Malcolm*, 520 F.2d 392, 399 (2d Cir. 1975); *Rhem v. Malcolm*, 507 F.2d 333, 341–42 (2d Cir. 1974); *Finney v. Arkansas Board of Correction*, 505 F.2d 194, 201 (8th Cir. 1974); *Gates v. Collier*, 501 F.2d 1291, 1319–20 (5th Cir. 1974); *Rozecki v. Gaughan*, 459 F.2d 6, 8 (1st Cir. 1972); *Jackson v. Bishop*, 404 F.2d 571, 580 (8th Cir. 1968). As the Court of Appeals of this Circuit has said in comparable circumstances:

> "[W]hatever sympathy it may have for those who must manage a great metropolis beset by grievous problems . . . [and, although] [i]t may not be simple to fashion a remedy that will remove the 'needless fetters' and unnecessary 'hardship,' threatening the spirit, health and sanity of detainees . . . such conditions cannot be condoned by continual inaction." *Rhem v. Malcolm*, 507 F.2d 333, 342 (2d Cir. 1974).

---

**5.** It should be noted that many of the improvements referred to in the text above were agreed to in the Stipulation and Order, which at the same time provided that the plaintiffs were entitled, as a matter of law, to the entry of a judgment which would remedy the problems caused by overpopulation.

**6.** That the City has space available to relieve the overcrowding at HDM was stressed by Mayor Koch in a television advertisement used to publicize the effectiveness of the very new handgun law. While walking past empty prison cells he warns the viewer that anyone illegally caught carrying a handgun will be imprisoned for one year, without opportunity to reduce the sentence by plea bargaining. The Mayor continues:

> "And as you can see, if you've got the gun we've got the room."

(New York Times, Aug. 12, 1980, at A18, col. 1.)

## III

In *Bell v. Wolfish*, the United States Supreme Court held that in evaluating the constitutionality of conditions of pretrial detention, the proper inquiry is whether these conditions amount to punishment of the detainee. The Court ruled that, absent a showing of an expressed intent to punish, a condition cannot be held to be unconstitutional unless it is not reasonably related to a legitimate nonpunitive governmental objective. The City argues that, judged by the standard of *Wolfish* and some few cases which have applied its rule–none in this circuit–the present overcrowding at HDM cannot be found to be unconstitutional.

There are several effective answers to the City's contention. First, the Stipulation by which the City agreed that the population of 1,350 at HDM was constitutionally impermissible was entered into eight months after the decision in *Wolfish*, at a time when the *Wolfish* rule was well known to all concerned. While this fact may not be dispositive, it surely suggests that at the time of the Stipulation the City conceded that a population of 1,350 at HDM was unconstitutional as measured by *Wolfish* itself.

Second, the *Wolfish* decision itself distinguishes between its applicability to the facility under consideration there–an altogether new federal house of detention which included such amenities as airconditioning, carpeting and lack of prison bars, among others–and the circumstances in what it described as "facilities markedly different from the MCC [the facility at issue in *Wolfish*]". The Court stated:

"The cases cited by respondents concerned facilities markedly different from the MCC. They involved traditional jails and cells in which inmates were locked most of the day. Given this factual disparity, they have little or no application to the case at hand. Thus we need not and do not decide whether we agree with the reasoning and conclusions of these cases." (441 U.S. 521, 543 n.27, 99 S.Ct. 1876 n.27).

Yet HDM is precisely a traditional jail which the Board of Correction of New York City has portrayed in April of this year as follows:

"The House of Detention for Men ('HDM') was built nearly fifty years ago to house sentenced prisoners [it now houses detainees awaiting trial] and was designed according to a now outmoded philosophy. By any standard HDM is a structure which is ill–suited to its present purpose. The inhumane cells, unsanitary facilities and unmanageable layout provide a barbaric setting to house detainees who have not yet been convicted of the crime for which they have been arrested, and confronts correction officers with inadequate security and sub–standard working conditions. This multi–tiered institution with its long stair corridors and depressingly small cells, has historically been the scene of tragedy and violence. The HDM riot and hostage taking of 1975 as well as numerous escapes and deaths have left an indelible mark on the New York City criminal justice system." (New York City Board of Correction Report on the Proposed Rikers Island Transfer, dated "April 1980" at 4–5).

Third, the *Wolfish* Court quite clearly indicates that overcrowding may constitute impermissible "punishment" within the meaning of its opinion. Its holding was merely that the record as to the quite different facility involved there did not establish the proposition.

"While confining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause as to whether those conditions amounted to punishment, nothing even approaching such hardship is shown by this record." (441 U.S. at 542, 99 S.Ct. at 1875 (footnote omitted)).

Here the record establishes that confinement of inmates at HDM has been conducted in such a manner over an extended period as to cause them to endure genuine

privation and hardship; it is stipulated that such confinement was unconstitutional in September 1979, and we have found that the condition of unconstitutionality has not been removed.

Fourth, the condition of overcrowding at HDM is not "reasonably related to a legitimate nonpunitive governmental objective." It is, of course, a legitimate objective for the City to hold its detainees in secure custody, but there is absolutely no evidence—and the City does not argue—that in order to accomplish this purpose it must hold 1,500 people in an ancient facility which all competent observers have found to be inadequate for more than 1,200 (some such observers find it inadequate for more than 1,000) and which the City itself stipulated to be inadequate for 1,350 only months ago.

We conclude that nothing in the *Wolfish* decision precludes granting relief here.

### IV

The scope of relief remains to be determined. Plaintiffs urge that the HDM population be reduced to 1,000. Yet it cannot be said that the record, as it stands, necessarily justifies that figure. While the State Commission, the City Board of Correction and the Correctional Association of New York have all on various occasions recommended that HDM is not adequate for confinement of more than 1,000 inmates, and while the views of these public or quasi public bodies—all of whom are highly experienced in the field—are entitled to respectful consideration, such recommendations have not been tested by the contest of litigation and stand unsanctioned to that extent. Accordingly, we believe it sounder to adopt the level which was approved by the State Correction Commission in its directive of September 21, 1977. That level was not only formally agreed to by the City at an earlier time, but sanctioned by the Attorney General of the State of New York in his capacity as counsel to the State Commission in enforcement proceedings brought against the City. The relief granted is allowed, however, without prejudice to the plaintiffs' further application for reduction of the population level to 1,000 on an augmented record.

The motion is granted to the extent of allowing a judgment that the population level at HDM be reduced to 1,200 and that population of the cell blocks be reduced in the proportion that present population bears to 1,200.

Submit judgment on notice.