718 F.2d 1247
 UNION COUNTY JAIL INMATES, Timmie Lee Barlow, Elbert Evans,
Jr., Raymond Skinner, James Wysocki, on behalf of
themselves and all other persons similarly situated
v.
V. William DIBUONO, Assignment Judge; Joseph G. Barbieri,
Criminal Assignment Judge; Cuddie E. Davidson, Jr., Bail
Judge; as Representatives of the Judges of the Criminal
Courts of Union County; Ralph Froelich, Union County
Sheriff; James Scanlon, Jail Administrator; Thomas
Hefferson, Jail Warden; Rose Marie Sinnot, Chairman, Board
of Chosen Freeholders; George Albanese, County Manager;
and their Successors in Office, in their official
capacities, Randolph Pisane and Louis J. Coletti
v.
William H. FAUVER, Commissioner, Department of Corrections,
State of New Jersey, and his Successor in his
official capacity.
Appeal of William H. FAUVER, Commissioner, New Jersey
Department of Corrections.
 No. 82-5310.
 United States Court of Appeals,
Third Circuit.
 Oct. 5, 1983.
 
 1
 SUR PETITION FOR REHEARING of 713 F.2d 984.
 
 
 2
 Before SEITZ, Chief Judge, ALDISERT, ADAMS, GIBBONS, HUNTER, WEIS, GARTH, HIGGINBOTHAM, SLOVITER and BECKER, Circuit Judges and WEBER, District Judge.*
 
 
 3
 The petition for rehearing filed by appellees, Union County Jail Inmates, Timmie Lee Barlow, Elbert Evans, Jr., Raymond Skinner, James Wysocki, on behalf of themselves and all other persons similarly situated, in the above entitled case having been submitted to the judges who participated in the decision of this court, and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.
 
 
 4
 Circuit Judges GIBBONS, A. LEON HIGGINBOTHAM and SLOVITER would grant the petition for rehearing.
 
 
 5
 Circuit Judge WEIS votes for rehearing but does not join in Circuit Judge GIBBONS' opinion.
 
 
 6
 Circuit Judge GIBBONS' statement sur denial of petition follows.
 
 
 7
 GIBBONS, Circuit Judge, dissenting from the denial of a petition for rehearing, with whom, A. LEON HIGGINBOTHAM and SLOVITER, Circuit Judges, join:
 
 
 8
 The Office of Inmate Advocacy of the New Jersey Department of the Public Advocate,[1] petitions for rehearing of a decision of this court which substantially reversed all of the relief ordered by the district court in an action challenging the constitutionality of conditions of confinement in the Union County, New Jersey Jail.[2] The minimum standards announced in the panel opinion for conditions of pretrial detention and post conviction confinement in this circuit are more severe than any that have been tolerated in any other locality in the United States.[3] Indeed those standards, considering that we are dealing with the treatment of human beings, compare unfavorably with the standards mandated by federal law for the treatment of animals.[4] Common human decency demands that the panel opinion be reconsidered by the full court. Moreover in arriving at a grossly inhumane and indecent result, the panel chose to disregard both the strictures of Fed.R.Civ.P. 53(e)(2) with respect to findings of fact made by a master, and the appropriate deference which should be accorded to the trial court in fashioning injunctive relief for past and threatened violations of the basic human liberties protected by the fourteenth amendment. Thus I dissent from the denial of the petition for rehearing.
 
 I.
 The Master's Findings
 
 9
 The Public Advocate's complaint seeks preliminary and permanent injunctive relief from all actions which confine inmates of the Union County Jail in such conditions of overcrowding as to deprive them of constitutionally protected rights. Hon. Harold A. Ackerman, the district court judge to whom the complaint was assigned, pursuant to Rule 53, on January 29, 1982 appointed Hon. Worrall F. Mountain as Special Master.[5]
 
 
 10
 That rule provides that "[i]n an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous." Fed.R.Civ.P. 53(e)(2). A court functioning in a reviewing capacity cannot make individualized findings which the master who heard the testimony did not make. Bennerson v. Joseph, 583 F.2d 633, 641 (3d Cir.1978). A reviewing court commits reversible error in failing to accept findings of a master which are not clearly erroneous. Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 689, 66 S.Ct. 1187, 1193, 90 L.Ed. 1515 (1946). "The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court." Fed.R.Civ.P. 52(a). As such, they are insulated, in the Court of Appeals, by the clearly erroneous standard of Rule 52. Thus there is no warrant in the law for factfinding in this court. The material facts found by the master with respect to the Union County Jail facility are as follows:
 
 
 11
 The UCJ is an aging eight story detention facility located in the heart of Elizabeth, New Jersey. It is designed to house for short periods of time, pretrial detainees and convicted individuals sentenced, in Union County, to prison terms of less than one year. N.J.S.A. 2C:43-10.
 
 
 12
 The prison contains 218 "general population" cells which are spread throughout 19 "tiers" or cellblocks on the third through fifth floors of the facility. Each cell is equipped with a single bed and a combination toilet/sink fixture and all but two of them measure approximately 39 square feet in area.[3] The general population cells on each tier open into a common area known as the "cell corridor" which is approximately 5 1/2 feet wide and varies in length from 40 feet to 70 feet depending upon the number of cells in a given tier.[4] It is in this area that the inmates spend the overwhelming majority of their waking hours.
 
 
 13
 3. Two remaining cells, one in A tier and the other in B tier, provide approximately 47 square feet of living space.
 
 
 14
 4. Twelve of the tiers contain twelve cells each and the cell corridor in each of these tiers measures approximately 5 1/2 feet by 60 feet or 330 square feet. Five tiers contain eight cells per tier and the cell corridors in these tiers are approximately 5 1/2 feet by 40 feet or 220 square feet. The remaining two tiers contain seventeen cells each and the cell corridors are approximately 5 1/2 feet by 70 feet or 385 square feet.
 
 
 15
 Inmates are locked in their cells between 10 p.m. and 6 a.m.; at all other times of the day they are permitted access to the cell corridor. Each cell corridor is equipped with one television set and one telephone. There are no lights in the cells or the cell corridors--the only illumination in these areas comes from the lights in the "officer's corridor" which runs parallel to the cell corridor and is separated from it by iron bars. The County concedes that lighting on the tiers could be improved and I have been informed that steps are being taken to that end.
 
 
 16
 In addition to the general population cells, there are currently three dormitories, two of them temporary, that are being used to house inmates. The "trustees/work release" dormitory on the first floor of the jail consists of two rooms separated by a wire mesh fence. The trustee side measures approximately 595 square feet and the work release side is approximately 513 square feet in area. The two rooms, combined, currently are capable of housing approximately 26 inmates on single and double bunk beds.
 
 
 17
 A portion of the men's exercise area has been converted into temporary dormitory use. This area, which is separated from the recreation area by a wire mesh partition, measures approximately 1,038 square feet and is capable of housing approximately 26 to 28 inmates. A second temporary dormitory has been constructed in what was formerly the women's recreation area adjacent to the women's tier on the fifth floor. This area measures approximately 374 square feet and is capable of housing approximately eight women. Inmates housed in the two male dormitories (except "trustees") spend the vast majority of each day confined to the dormitory area. The women housed in the temporary women's dormitory, for security reasons, spend their waking hours locked in the cell corridor on the women's tier with all other women prisoners.
 
 
 18
 In addition to the general population cells, there are ten detention/isolation cells at the UCJ ranging in size from 83 square feet to 113 square feet. These cells are used to house inmates guilty of disciplinary infractions or inmates in need of isolation, e.g., for medical reasons. Each cell contains a single bed and some are equipped with toilet fixtures.
 
 
 19
 App. at 66-69.
 
 
 20
 The quoted findings describe a facility designed to hold 218 general population inmates, on a short term basis; so short that no provision was made in the cellblocks for illumination which would permit the inmates to read. In addition to the designed capacity of 218 general population inmates, the "trustees/work release" dormitory houses 26 inmates. Thus arguably the facility's designed capacity is as high as 244 inmates. By converting the men's exercise area and the women's recreation area to dormitory space, the County has increased the capacity to 278 inmates.
 
 
 21
 The material facts found by the master with respect to inmate population, as contrasted with capacity, are as follows:
 
 
 22
 In recent months, the daily population of the UCJ has averaged well over 300 inmates. The population on the day I toured the facility, February 8, 1982, was 350 inmates, 92 of whom were awaiting transfer to state prisons. On February 15, 1982, the population had risen to 359, 81 of whom have been sentenced to and are awaiting transfer to state facilities.[5] Of the 359 inmates housed at the UCJ on February 15, 1982, 196 had been there for 45 days or more and 131 had been there for at least 75 days. Of the 131 inmates housed for 75 days or more, 57 were state sentenced prisoners. As of February 15, 1982, 206 pretrial detainees were being held at the UCJ.
 
 
 23
 5. I have been informed that as of February 24, 1982, the total inmate population at the UCJ was 385. Of that total, 101 were awaiting transfer to a state correctional institution.
 
 
 24
 Despite extensive efforts by the defendant, County, to create sufficient bed space to handle the overflow of prisoners, jail administrators simply have been unable to create suitable housing for all inmates. For the past several months, the County has been forced to "double cell" inmates on the general population tiers. Since there is only one bed in each of the individual cells, double celling requires that one inmate sleep on a mattress placed on the floor at night. This second mattress, measuring approximately 16 square feet, must be placed adjacent to the toilet in the cell. It occupies virtually all of the otherwise free floor space in the cell. The parties agree that some inmates have been double celled for extended periods of time (several weeks). Further, it is agreed that the overwhelming majority of inmates subjected to the double celling practice have been pretrial detainees.[6]
 
 
 25
 6. Out of a total of 162 inmates being double celled in general population cells on February 24, 1982, approximately 142 were pretrial detainees.
 
 IRLANDA
 
 26
 Double celling of large numbers of inmates in the UCJ has resulted in a serious reduction in the amount of square footage available per inmate, both in the cells themselves and in the cell corridors. With respect to the individual cell conditions double celling, of course, requires that two inmates share a total of 39 square feet of space for approximately eight hours per night. During the day, the average square footage per inmate is somewhat higher because during daytime hours inmates have access to their cells and the cell corridor. Depending upon the extent of double celling on any given tier at a particular point in time, however, the average square footage per inmate during daytime hours is still very low.
 
 
 27
 For example, in each tier with twelve individual cells, the combined square footage of the cells and the cell corridor is approximately 798 square feet.[7] Thus, when those tiers are operating at normal maximum levels (one inmate per cell) there exists approximately 67 square feet of "daytime" space per inmate which includes the beds and toilet/sink fixtures. In each tier with eight cells, the daytime figure is approximately 66 square feet per inmate and in the two tiers with seventeen cells that figure is approximately 62 square feet per inmate. When double celling is practiced in one-half of the cells in any 12-cell tier, the square footage available per inmate during daytime hours is reduced by one-third, to approximately 45 square feet (44 square feet in the tiers with 8 cells; 41 square feet in the tiers with 17 cells). When double celling is present throughout all cells in a 12-cell tier, the square footage per inmate during daytime hours is reduced to 33.5 square feet (33 squ
 
 
 28
 7. The combined square footage figure is calculated as follows:
 
 
 29
 cell corridor; 60 ft. x 5.5 ft. = 330 sq. ft.
 
 
 30
 12 cells; 12 x 39 ft. = 468 sq. ft.
 
 
 
 [798]
 sq. ft
 The square footage of the cells and cell corridor in each of the 8-cell tiers is approximately 530 sq. ft. calculated as follows:
 cell corridor; 5.5 ft. x 40 ft. = 220 sq. ft.
 
 
 [8]
 cells; 8 x 39 ft. = 312 sq. ft
 
 
 
 31
 532 sq. ft.
 
 
 32
 The square footage of the cells and cell corridor in the 17-cell tiers is approximately 1,057 sq. ft. calculated as follows:
 
 
 33
 cell corridor; 70 ft. x 5.5 ft. = 385 sq. ft.
 
 
 34
 16 cells; 16 ft. x 39 ft. = 624 sq. ft.
 
 
 35
 one cell; 1 x 47 ft. = 47 sq. ft.
 
 
 
 1,056 sq. ft.
 are feet in 8 cell tiers; 31 square feet in 17 cell tiers).[8] For purposes of comparison, it is noted that the New Jersey administrative regulations governing new prison construction provide that all future single occupancy cells shall be not less than 70 square feet in area and further provide that separate day rooms containing 35 square feet per inmate shall be constructed in each new jail. N.J.A.C. 10A:31-2.8(a)(4)(12). Thus, current New Jersey regulations suggest that the "ideal" square footage per inmate housed in a county jail should be approximately 105 square feet.[9]
 
 
 [8]
 As of February 24, 1982, there was "total" double celling on 3 tiers, the A and B tiers (34 inmates in each 17-cell tier) and the women's tier (24 inmates in a 12-cell tier). When total double celling is present throughout the women's tier, as was the case on February 24, 1982, female inmates at the UCJ actually have even less average square feet per inmate during daytime hours than indicated in the text for a typical 12-cell tier. The reason is that all women housed in the female dormitory are moved into the sole women's cell corridor during daytime hours for security reasons. This further exacerbates the overcrowding conditions in the women's cell corridor. On February 24, 1982, for example, 32 women were being housed on the tier during daytime hours. Thus, the average square footage per inmate was a paltry 25 feet
 
 
 [9]
 While the United States Supreme Court in Bell v. Wolfish stated that statistics similar to those found in N.J.A.C. 10A:31-2.8 "do not establish the constitutional minima" for average square footage per inmate, the Court did acknowledge that they "may be instructive in certain cases". 441 U.S. 520, at 542, n. 27, 99 S.Ct. 1861, 1876 n. 27, 60 L.Ed.2d 447, 471 (1979)
 In addition to the extensive use of double celling provoked by the overcrowding problem, when the UCJ population reaches the 365-370 figure, jail officials are forced to require some inmates to sleep on mattresses placed on the floor in places such as the laundry area and the law library area. These inmates must continue to sleep on mattresses until there is a drop in the population count or until released or sent to another facility. It is undisputed that some inmates might be required to sleep on mattresses laid on the floor in various parts of the jail for extended periods of time.
 The overcrowding conditions in the detention/isolation cells at the UCJ are the most serious in the jail. As of February 8, 1982, there were a total of 32 inmates being housed in ten detention/isolation cells for a variety of disciplinary reasons.[10] Some of these cells currently are being used to house as many as four inmates for extended periods of time. Since each detention cell is designed to hold only one inmate and is equipped with but a single bed, as many as three inmates have been forced to sleep on mattresses laid on the floor of the cells. In cells with three or four prisoners, these mattresses take up a very large percentage of the floor space. There are no cell corridors in the detention cell area and, thus, detention inmates are forced to spend all but a few hours a week confined to the cell itself.[11] Some of the detention cells are equipped with a toilet/sink fixture and group showers are provided to detention/isolation inmates daily.
 
 
 [10]
 One inmate was being housed in isolation for medical reasons. Thus, 31 inmates were sharing the nine other detention cells
 
 
 [11]
 Detention cell inmates currently are permitted to enjoy the limited recreation and visitation privileges available to general population inmates. See infra 1252 - 1254
 App. at 69-74.
 These findings establish that the inmate population has at times reached the point where female inmates have been allotted 25 square feet of living space (less space for toilet, washstands and bunks), and male inmates have been allotted 33.5 square feet (less space for toilets, washstands and bunks). Since a mattress measures 16 square feet, a bunk must occupy at least that much space. A toilet and washstand large enough to be functional for adults must occupy at least another two square feet. Thus the master's findings establish that women inmates have at times been allocated as little as 7 square feet of space in which to function over protracted periods, and men inmates as little as 15.5 square feet.[6] The absence of illumination in the cells suggests that even staying in bed all day to read is not a viable alternative.
 The material facts found by the master with respect to the effects of the overcrowding which he found are as follows:
 The severe overcrowding conditions outlined above have had an adverse impact on numerous aspects of the inmates lives. The overcrowding has severely taxed the County's available resources and make it impossible for it to continue to comply with certain state regulations governing the operations of county jails. One of the most serious cutbacks has occurred in the area of inmate recreational privileges. N.J.A.C. 10A:31-3.16(b)(10) provides that inmates housed in county jails are to be "permitted at least one hour of physical exercise and recreation each day outside the housing unit." Due to the large inmate population and the reduction in the size of the men's recreation area, prison officials have been forced to limit male recreation privileges to no more than one hour periods, twice per week. I note that the recreational equipment available to male prisoners is extremely limited consisting primarily of a ping-pong table and a weight machine. Under existing conditions, I find that there is almost no realistic opportunity for male inmates to enjoy recreation while confined at the UCJ. Further, the total elimination of what was formerly the women's recreation area has resulted in the suspension of all recreational privileges for women. The absence of a meaningful opportunity for the male and female inmates housed at the UCJ to enjoy physical exercise is particularly disturbing in view of the conditions of inmate confinement in the cell corridors. [citation omitted].
 Another inmate privilege sharply curtailed as a result of the overcrowding problem is visitation privileges. The former visitation policy permitted inmates to visit with family and friends, for anywhere from fifteen minutes to one-half hour, three times per week. As a result of the sheer volume of visitors arriving at the UCJ on visitation days, the County has been forced to limit the time for each visit to a maximum of five to ten minutes. Even with this shortening of visitation time, jail officials are not always able to accommodate the large number of visitors.
 A second area in which I find that the County has been unable to comply with State regulations is with regard to the provision of clean clothing to inmates. N.J.A.C. 10A:31-3.13(b)(5) requires that inmates be provided with a complete change of clothing at least once weekly and that clean towels be provided daily. While jail officials stated that they have made every effort to comply substantially with this regulation, I am persuaded by the several affidavits submitted to me by the inmates that there has not been complete compliance. There have been allegations that some inmates have been required to wear the same clothing for periods of several weeks or more. I find that the County's inability to comply with this important regulation is entirely attributable to the overcrowding conditions.
 I find that the provision of other services to inmates has been curtailed and/or delayed as a result of the prison overcrowding. Prison officials continue to provide the inmates with counseling programs, chapel services, educational activities, access to the general library and law library, and other related programs, but the staffing available to administer these various programs is limited and officials admit that they have encountered problems in administering these services.
 I find that the sanitary conditions of the inmate housing areas and the kitchen are satisfactory. The food service is adequate and I note that both the inmates and the corrections officers eat the same diet from the prison kitchen. I find that the provision of medical and dental services to inmates is adequate except in one important respect. County officials acknowledge that new inmates are not given a complete physical examination at the time of commitment. Officials from the State Department of Corrections testified that the absence of such a program could pose a serious health risk to the inmates and I share those views.
 There is no question that the overcrowding situation has resulted in an increase in scattered instances of inmate fighting, etc., at the UCJ. County officials testified that there was a recent stabbing incident in one of the cells, which arose from a dispute between double celled inmates as to which inmate was going to sleep on the mattress laid on the floor. I do not find, nor do any of the parties assert, that the increased tensions in the jail amount to a serious security problem at the present time. I think it bears noting, however, that all parties believe that, if the current overcrowding conditions carry over into the hot summer months, an extremely volatile situation will be presented.
 App. at 74-78.
 These findings establish that the female inmates spend protracted periods deprived of all recreation opportunities, that male inmates fare little better with respect to recreation, that both men and women are afforded few visitation privileges, have been deprived of sanitary clothing, have had access to reading materials terminated, have been exposed to the risk of transmitting infectious diseases, and in some instances have been forced to sleep on mattresses on the floor in inappropriate locations, all as a result of overcrowding. No wonder, then, that the Master also found that overcrowding has already resulted in an increase in scattered instances of inmate fighting, etc., but that conditions of overcrowding creates a risk of other more serious problems involving violence.
 The Master concluded that the conditions described in these findings violated the fourteenth amendment, and recommended, among other steps a reduction, over a reasonable period, of the inmate population to its actual capacity of 244, preferably by removing sentenced inmates to state facilities. App. at 93. That recommendation tacitly rejected the testimony of certain state officials that the Union County Jail could, with certain adjustments, actually house 369 inmates.
 II.
 The State Defendants' Objections
 to the Master's Report
 The Objections to the Master's Report filed by the Attorney General did not take serious issue with the facts found by Justice Mountain. Indeed the Attorney General observed:
 As has been true throughout these proceedings, there is no significant controversy between the parties as to most of the essential facts in the case with certain exceptions which will be set forth herein. The dispute between the parties has focused (and continues to focus) on the legal conclusions drawn from underlying facts, and assuming arguendo, that the operations of the Union County Jail are deficient in some respects, from a constitutional standpoint, what the appropriate remedies are--the Special Master's proposed conclusions of law and his recommendations.
 App. at 102. The "certain exceptions" referred to in the Objections to the Master's Report dealt for the most part not at all with the facts as to the facilities, the population, and the consequences of housing that population in those facilities. They dealt only with the recommendation that the population be reduced. It was the Attorney General's position that the Master should have accepted his expert's testimony "that with certain space adjustments, the jail could actually house 369 inmates without the necessity of double-celling and at the same time achieving recreation for inmates of both sexes." App. at 110.
 The Attorney General did not concede, however, that even the adjustments which his expert suggested were required by the fourteenth amendment. Rather, he urged:
 Finally, the Special Master's constitutional findings are seemingly premised on stricter standards of inmate comfort than the minimum constitutional standard established by the United States Supreme Court. Careful scrutiny establishes that the jail conditions, while not ideal, are not in fact unconstitutional. As to the convicted inmates, no "pain" let alone "unnecessary or wanton pain" is inflicted. Discomfort or annoyance, yes; but pain, no. As to the detainees, conditions are not imposed to punish, but merely to secure the jail and manage the jail and accommodate it to the large population.
 App. at 110-11.
 Two things are significant about the Attorney General's Objections to the Master's Report. The first is that he urged that as a matter of law no remedy was required. The second is that he did not urge, as a remedy for any violation which might have occurred, the continuation or extension of the practice of double-celling. See App. at 149-50.
 At a later stage in the proceeding, after the court heard argument on the Objections to the Master's Report, the Attorney General stated his position on the double-celling practice. In a supplemental brief he urged that all of the conditions found by the Master to be violations of law could be alleviated by placing double bunks in the 218 general population cells. App. at 176. This would, of course, permit an increase in the potential population from 359 to at least 464 (436 in the general population cells and 28 in the "trustees/work release" dormitory). The alleviation would occur by virtue of the elimination of the two temporary dormitories housing 28 men and 8 women. The Attorney General's proposal, then, was to permit the confinement of two adults in a space of 39 square feet between 10 p.m. and 6 a.m., relieved by access to the cellblock corridors, and by such recreation off the cellblock as could be provided in two restored recreation areas designed for a prison population of 218. The proposal did not suggest how other deprivations, which the Master found to be the result of overcrowding, could be alleviated by an increase in population.
 III.
 The District Court's Ruling
 The district court reviewed the Master's findings of fact in accordance with the standard specified in Rule 53(e)(2) and concluded:
 I have determined that none of the proposed findings of fact are clearly erroneous, and I shall therefore adopt them without modification.
 Union County, supra, 537 F.Supp. at 1001. Addressing the Attorney General's contention that even with double bunking no constitutional violation occurred, the court observed:
 The stark reality is that, whether provided with bare mattresses or mattresses placed on a frame, when the 39 square feet general population cells are shared by two persons, each person has 19.5 square feet of space inclusive of furniture and fixtures for the period of lock-up at night. Double-bunking in the UCJ is therefore roughly equivalent to quadruple-bunking in the MCC at issue in [Bell v] Wolfish [441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) ]. Such spatial starvation cannot pass muster constitutionally. Even the incarcerated are entitled to something more than a walk-in closet.
 Furthermore, there is no relief during the day from the adverse effects of overcrowding. As the Special Master found:
 The cell corridors and dormitories where the inmates spend the overwhelming majority of their waking hours are cramped, overcrowded and would allow little opportunity for free movement or exercise even at normal population levels. The pretrial detainees currently housed in general population cells or dormitories at the UCJ can do little more than watch television from 6:00 a.m. in the morning to 10:00 p.m. at night.
 SMR, at 22. If I assume that only half of the cells on any one tier are to be double-bunked under the Commissioner's proposed remedy,[17] the average corridor space per person for daytime use will be between 15 and 21 square feet. Added to one person's share of the space of a double-bunked cell, a pretrial detainee at the UCJ is restricted nearly twenty-four hours a day to an area which the Court in Wolfish rules was barely sufficient for sleeping purposes. It falls far short of the 105 square feet governing new prison construction in this state. N.J.A.C. 10A:1-2.8(a)(4), (12).
 
 
 [17]
 This premise is reasonable when based on a population at the UCJ of at least 359 because, assuming I order the elimination of the temporary dormitories and I restrict the detention cells to no more than double occupancy as recommended by the Special Master, 115 out of the 218 general population cells would have to be double-celled. On the day the Special Master toured the UCJ, three tiers were totally double-celled, restricting these inmates to less than 15 square feet of corridor space
 Other courts have found jails with similar or more generous spatial dimensions than those in the UCJ unconstitutional. See Lareau, supra; Campbell v. Cauthron, 623 F.2d 503 (8th Cir.1980); Heitman v. Gabriel, 524 F.Supp. 622 (W.D.Mo.1981); Vazquez, supra; Hutchings v. Corum, 501 F.Supp. 1276 (W.D.Mo.1980); Benjamin v. Malcolm, 495 F.Supp. 1357 (S.D.N.Y.1980). Thus based solely on considerations of space, I find that doublecelling or double-bunking at the UCJ subjects pretrial detainees to genuine hardships amounting to punishment in violation of the Fourteenth Amendment.
 My decision does not rest upon an incorporation into the Due Process Clause of the various correction associations' recommendations with respect to the number of square feet appropriate for daytime space in a jail such as that contained in N.J.A.C. 10A:31-2.8(a). See Wolfish, supra, 441 U.S. at 543-44 n. 27, 99 S.Ct. at 1876-77 n. 27. However, the 30 to 40 square feet allotted to a double-bunked detainee is grossly inadequate in comparison to any of these professional standards.[18]
 
 
 [18]
 For a summary of the recommendations of various commissions, courts and professional organizations, see 3 National Institute of Justice, American Prisons and Jails 2-7 (1980). The recommendations range from 50 to 80 square feet per inmate. Approximately 88% of local jails, according to the National Jail Census, have at least 40 square feet of floor space. 1 National Institute of Justice, American Prisons and Jails 83 (1980)
 Furthermore, overcrowded cells cannot be examined for constitutionality in isolation from the overall circumstances in the facility. Wolfish, supra, 441 U.S. at 525, 99 S.Ct. at 1866. In MCC, the hardships, if any, which are imposed upon pretrial detainees by double-bunking are mitigated by the unlimited daytime access to the large common areas. In UCJ, the more serious privations are aggravated by the overcrowded corridors, and the lack of meaningful recreation and other necessities. (For the female inmates, there is a lack of any recreation.) What the Second Circuit stated in Lareau with respect to the detention facility in Hartford, Connecticut, is applicable here: "[T]here is no real respite for the double-bunked inmate from the pressures of overcrowding." 651 F.2d at 101.
 Union County, supra, 537 F.Supp. at 1005-06 & nn. 17-18.
 Addressing the Attorney General's contention that by double-bunking the general detention cells the temporary dormitories could be eliminated, and the dormitory space restored to recreational uses, the court observed:
 The Commissioner proposes that elimination of the temporary dormitories for the men and women in conjunction with the establishment of a double-bunking practice would remedy any unconstitutional condition at the UCJ. I find this proposal to be unsatisfactory. It is doubtful that recreation will improve so long as the population is as high as it has been for several months even if the size of the recreation room is returned to its normal dimensions. The third-party defendant, in effect, is proposing a trade-off of one "genuine privation" for another. Either the pretrial detainees suffer increased crowding in the cells in order to enjoy slightly improved recreation opportunity or they suffer with the present recreation situation in order to enjoy slightly less crowded cells.[20]
 
 
 [20]
 The impact of double-celling has been greatest on the pretrial detainees. Of the 162 inmates subject to double-celling on February 24, 1982, 142 were pretrial detainees. SMR at 8 n. 6. This degree of double-celling occurred even though there has been established at the UCJ two temporary dormitories in the former recreation spaces. Recreation and housing in the UCJ are flip sides of the same coin
 Nor is access to a crowded corridor an adequate substitution for real exercise and recreation. The Special Master found the corridors sufficient only for passive activities, such as watching television.
 Union County, supra, 537 F.Supp. at 1006.
 The court also addressed the effect that the double-bunking proposal would have on visitation privileges, noting:
 The overcrowded condition of the UCJ is the cause not only of inadequate recreation but also, as found by the Special Master, of reduced visitation privileges. This, too, aggravates the tensions already present because of double-bunking. As testified to by Assistant Commissioner Hilton, visitation has a very significant impact on the mental well-being of an incarcerated person.[21] Under the present circumstances, visits have been limited to five to ten minutes, if not indirectly discouraged altogether.[22]
 
 
 [22]
 For some friends and relatives, the prospect of a five-minute visit cannot justify the travel and waiting time. See, e.g., Affidavits of Inmates Terrell and Thomas, SMR Appendix at A91-96
 Id.
 Looking at the totality of circumstances, the court concluded:I have determined that double-bunking at the UCJ violates the due process rights of pretrial detainees. It constitutes "confining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardships over an extended period of time." Wolfish, supra, 441 U.S. at 542, 99 S.Ct. at 1875.
 Union County, supra, 537 F.Supp. at 1007. Addressing the distinct problem of sentenced inmates in light of the same totality of circumstances, the Court concluded:
 Although the standard against which the court must judge conditions imposed upon sentenced offenders is more stringent than that which guides the analysis of the conditions of confinement of pretrial detainees, I find that the conditions at the UCJ are too egregious to satisfy either standard. Double-bunking, as practiced at the UCJ or as proposed, except in the detention/isolation cells, violates the Eighth Amendment as well as the Fourteenth Amendment.
 Union County, supra, 537 F.Supp. at 1008-09.
 It is plain that neither the master nor the district judge focussed on isolated phenomena at the Union County Jail as violations of the Constitution. Rather the violation found by both was the overall condition of overcrowding; the practice of confining human beings over long periods in space so small that they would inevitably suffer severe stress from lack of exercise, lack of variety in activity, too frequent intimate contact with fellow inmates, and too little contact with friends and counselors. The Court's declaratory judgment is explicit in this regard:
 ORDERED that the findings of fact of the Special Master be adopted and that the Union County Jail be declared unconstitutionally overcrowded.
 Union County, supra, 537 F.Supp. at 1014.
 In fashioning a remedy for the overall condition of overcrowding, the court carefully weighed competing considerations. Since the overall condition of overcrowding was the constitutional violation which was found, the court addressed that problem directly by fixing the maximum capacity of the Union County Jail, until it is enlarged, at 259, with one person in each general population cell and 26 persons in the "trustee/work release" dormitory. Id. at 1015 (Order of April 27, 1982, paragraph (g)). That Order conforms to the Master's finding that the Maximum Capacity of the facility was 244 as it stood, and 259 on completion of 15 new intake cells. Because that population level could not be achieved at once, the court provided three months within which to comply. Because New Jersey statutes provided that sentenced inmates should normally be removed to state penal institutions, while county jails are normally available for housing of pretrial detainees, the court ordered that sentenced prisoners be removed. Union County, supra, 537 F.Supp. at 1015.
 Given the district court's finding that the overall condition of overcrowding was the constitutional violation, the central provision of the judgment, fixing a maximum number of inmates, was tailored precisely to that violation. The time limit for accomplishing that relief was well within any rational limits of district court discretion in fashioning remedies. The decision to require removal of sentenced inmates was a reasonable accommodation between the competing demands upon the limited space of the Union County defendants for housing of pretrial detainees and of the state defendants for warehousing sentenced inmates.
 IV.
 The Panel Decision
 On appeal the Attorney General reiterated the argument that even if every general population cell were double-bunked and filled there would be no constitutional violation of the rights of either the pretrial detainees or the sentenced inmates. The panel accepted this argument in toto, by vacating the central provision of the district court's remedial order, which fixed a maximum population for the Union County Jail. Union County Jail Inmates v. Scanlon, 713 F.2d 984, 1002-1003 (3d Cir.1983). The effect of this Court's judgment is that there is no limit on overcrowding. The panel opinion endorses the position that each of the general population cells may be double-bunked, that the "trustees/work release" dormitory may be retained, and that the 15 new intake cells could be double-bunked. See Id. at 996. The vacation of the Order fixing a maximum, with a clear indication that double bunking would be permitted in the general population cells and the fifteen new intake cells, suggests that on remand the district court must tolerate, in a facility designed for the temporary short term custody of 233 persons (218 general population cells and 15 new intake cells), a population as high as 494 inmates. At that population, or anything even nearly approaching it, the spatial constraints on the inmates will be, in proportion to size, and considering differences between men and beasts, far more severe than federal law tolerates for animals under the statutes and regulations governing their custody. See 9 C.F.R. Secs. 3.128, 3.78(b) (1983).
 In arriving at so fundamentally inhumane a result, moreover, the panel completely ignored the limits of their reviewing authority imposed by Rules 52 and 53. Freely substituting their own factfinding for that of the Master, the panel members simply rewrote the facts to make it seem that the conditions in the Union County Jail are other than as found by the Master and the district court. Examples follow.
 The Master found that "[t]he cell corridors ... where the inmates spend the overwhelming majority of their waking hours are cramped, overcrowded and would allow little opportunity for free movement or exercise even at normal population levels." App. at 84. The panel, which unlike the Master, did not observe the facility first hand, finds that a cellblock corridor, even when the cells are fully double-bunked, "does provide adequate space for such exercises as push-ups, sit-ups, and even walking." Union County, supra, 713 F.2d at 1000 n. 29. Imagine, if you can, the degree of social cooperation which would be required for the suggested exercises when 24 persons occupy a space measuring 60 feet X 5.5 feet ! Compare the requirement that "[e]ach nonhuman primate housed in a primary enclosure shall be provided with a minimum floor space equal to an area of at least three times the area occupied by such primate when standing on four feet." 9 C.F.R. Sec. 3.78(b)(2) (1983).
 The panel relies upon the "promised daily hour of recreation" as a factor mitigating the inevitable tensions resulting from 23 hours in the cramped conditions of the cellblock. The district court found, however, that "[i]t is doubtful that recreation will improve so long as the population is as high as it has been for several months even if the size of the recreation room is returned to its normal dimensions." Union County, supra, 537 F.Supp. at 1006. There is no finding by the Master or the district court supporting the panel's speculation that the restored recreation rooms will suffice to provide even one hour off the cellblock in 24. There is no record support for that speculation. The record establishes that the recreation rooms were built for a population of 244, not 494. See App. at 90. Even if operated around the clock they are not likely to provide significant alleviation from the tension generated by 23 hours a day cheek to jowl in the cellblocks; that, entirely aside from the logistical problem of moving so many persons through the antiquated facility.
 The panel concluded that despite an increase in population, clean clothing would be provided. Union County, supra, 713 F.2d at 995. In so finding, the panel rejected a specific finding by the Master that "[w]hile jail officials stated that they have made every effort to comply substantially with this regulation [requiring a change of clothing at least once a week and clean towels daily], I am persuaded by the several affidavits submitted to me by the inmates that there has not been complete compliance.... I find that the County's inability to comply with this important regulation is entirely attributable to overcrowding conditions." App. at 76. No record evidence supports the panel's illogical speculative finding that if the overcrowding is increased the county's ability to comply will increase rather than decrease.
 The panel finds that the effects of overcrowding on the cellblocks would be "mitigated" by "promised visitation." Union County, supra, 713 F.2d at 996 n. 17. The Master found that:
 As a result of the sheer volume of visitors arriving at the UCJ on visitation days, the County has been forced to limit the time for each visit to a maximum of five to ten minutes. Even with this shortening of visitation time, jail officials are not always able to accommodate the large number of visitors.
 App. at 76. One may search the record in vain for a shred of evidence that with an increased population the County jail officials will be better able to accommodate the larger number of visitors.
 In an effort to minimize the appearance of harshness in its procrustean decree the panel attempts its own analysis of duration of confinement of pretrial detainees. Union County, supra, 713 F.2d at 996-997 & n. 18. In doing so, however, it selects, not the list of inmates dated February 15, 1982 which was considered by the Master and the district court in making their findings, but a list dated a month earlier which, not surprisingly, produced a lower percentage of pretrial detainees confined at the Union County Jail for over 60 days.
 Even with respect to the highest recorded inmate population, the panel made a finding of 385, Union County, supra, 713 F.2d at 995 n. 14, whereas the district court correctly found that on April 19, 1982 the jail population had reached 392 inmates. Union County, supra, 537 F.Supp. at 999.
 Finally, and inexplicably, the panel simply ignores findings by the Master and the district court that instances of fighting amongst the inmates have increased due to the overcrowded conditions at UCJ. App. at 77; Union County, supra, 537 F.Supp. at 1000. Apparently the inevitable propensity for violence resulting from confining human beings in excessively close proximity to each other over long periods without relief is not deemed relevant in the panel's constitutional calculus.
 As to the law announced in the panel opinion, I will say no more than that Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), on which it principally relies, lends no support for the proposition that human beings can lawfully be subjected by a state to the conditions of confinement found by the Master. The opinion of the district court correctly analyzes the caselaw. By disregarding the Master's findings, and fragmenting the case as if it did not involve an interrelated set of intolerable conditions, all resulting from overcrowding, the panel opinion has applied bits and pieces of language in Bell v. Wolfish in a manner the Supreme Court never intended. See Lareau v. Manson, 651 F.2d 96, 99-105 (2d Cir.1981); Lock v. Jenkins, 641 F.2d 488, 491-94 (7th Cir.1981); Jones v. Diamond, 636 F.2d 1364, 1373-74, 1375-76 (5th Cir.) (in banc), cert. dismissed sub nom. Ledbetter v. Jones, 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981); Campbell v. Cauthron, 623 F.2d 503, 504-08 (8th Cir.1980).
 V.
 Conclusion
 A society whose laws provide for greater attention to the conditions of confinement of animals than for the conditions of confinement of human beings is pathological. In the name of our common humanity we dissent from the denial of rehearing.
 
 
 *
 Honorable Gerald J. Weber, United States District Judge for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 The New Jersey Public Advocate is a cabinet level state officer charged with a variety of public functions. N.J.Stat.Ann. 52:27E-1 to -47 (West Supp.1983-1984). New Jersey law creates, in the Office of the Public Defender, the Office of Inmate Advocacy. N.J.Stat.Ann. 52:27E-10 (West Supp. 1983-1984). That office is charged with the responsibility of representing the interests of inmates in jails, prisons, penitentiaries and similar facilities in New Jersey. N.J.Stat.Ann. 52:27E-12 (West Supp.1983-1984)
 
 
 [2]
 The district court opinion is reported. Union County Jail Inmates v. Scanlon, 537 F.Supp. 993 (D.N.J.1982)
 
 
 [3]
 See Lareau v. Manson, 651 F.2d 96 (2d Cir.1981); Lock v. Jenkins, 641 F.2d 488 (7th Cir.1981); Jones v. Diamond, 636 F.2d 1364 (5th Cir.) (en banc), cert. dismissed sub nom. Ledbetter v. Jones, 453 U.S. 950, 103 S.Ct. 27, 69 L.Ed.2d 1033 (1981); Campbell v. Cauthron, 623 F.2d 503 (8th Cir.1980); Fischer v. Winter, 564 F.Supp. 281 (N.D.Cal.1983); Martino v. Carey, 563 F.Supp. 984 (D.Ore.1983); Campbell v. McGruder, 554 F.Supp. 562 (D.D.C.1982), on remand from 580 F.2d 521 (D.C.Cir.1978); McMurry v. Phelps, 533 F.Supp. 742 (W.D.La.1982); Vasquez v. Gray, 523 F.Supp. 1359 (S.D.N.Y.1981); Hutchings v. Corum, 501 F.Supp. 1276 (W.D.Mo.1980); Benjamin v. Malcolm, 495 F.Supp. 1357 (S.D.N.Y.1980)
 
 
 [4]
 See Animal Welfare Act, 7 U.S.C. Secs. 2131-2156 (1976); Cruelty to Animals Act, 45 U.S.C. Secs. 71-74 (1976); implementing regulations, 9 C.F.R. Secs. 1-4 (1983)
 
 
 [5]
 The Special Master, a former Justice of the Supreme Court of New Jersey, is particularly well qualified for that position. The district court judge is also particularly knowledgeable about the conditions of the Union County Jail, having served for many years in Union County as Judge of the New Jersey Superior Court
 
 
 [6]
 Federal regulations for the humane treatment of nonhuman primates provide:
 Space requirements. (1) Primary enclosures shall be constructed and maintained so as to provide sufficient space to allow each nonhuman primate to make normal postural adjustments with adequate freedom of movement.
 (2) Each nonhuman primate housed in a primary enclosure shall be provided with a minimum floor space equal to an area of at least three times the area occupied by such primate when standing on four feet.
 
 
 [9]
 C.F.R. Sec. 3.78(b) (1983). Federal regulations for humane treatment of certain other warm blooded animals provide:
 Enclosures shall be constructed and maintained so as to provide sufficient space to allow each animal to make normal postural and social adjustments with adequate freedom of movement. Inadequate space may be indicated by evidence of malnutrition, poor condition, debility, stress, or abnormal behavior patterns.
 
 
 [9]
 C.F.R. Sec. 3.128 (1983). See also, 9 C.F.R. Sec. 3.104 (space requirements for humane treatment of marine mammals). The conditions of crowding for human beings found by the master would, if imposed on animals, violate federal law
 A typical federal judge's desk top is approximately 22 square feet.